ACCEPTED
01-14-01018-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
1/28/2015 6:06:44 PM
CHRISTOPHER PRINE
CLERK

### NO. 01-14-01018-CV

## IN THE COURT OF APPEALS
## FOR THE FIRST DISTRICT OF TEXAS
## HOUSTON, TEXAS

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
1/28/2015 6:06:44 PM
CHRISTOPHER A. PRINE
Clerk

## RICKY D. PARKER AND JAMES MYERS
*Appellants*

### v.

## SCHLUMBERGER TECHNOLOGY CORPORATION
*Appellee*

Interlocutory Appeal
from the 268th Judicial District Court of Fort Bend County, Texas
Cause No. 14-DCV-218252

## APPELLANTS RICKY D. PARKER AND JAMES MYERS'
## BRIEF ON THE MERITS

Levon G. Hovnatanian
State Bar No. 10059825
*hovnatanian@mdjwlaw.com*
Robert T. Owen
State Bar No. 24060370
*owen@mdjwlaw.com*
Kevin G. Cain
State Bar No. 24012371
*cain@mdjwlaw.com*
MARTIN, DISIERE, JEFFERSON &
WISDOM, L.L.P.
808 Travis, 20TH Floor
Houston, Texas 77002
(713) 632-1700 – Telephone
(713) 222-0101 – Facsimile

## ORAL ARGUMENT REQUESTED

## IDENTITY OF PARTIES AND COUNSEL

**APPELLANTS/DEFENDANTS**

Ricky D. Parker and James Myers

In this appeal, Mr. Parker and Mr. Myers are represented by the following attorneys:

Levon G. Hovnatanian
State Bar No. 10059825
*hovnatanian@mdjwlaw.com*
Kevin G. Cain
State Bar No. 24012371
*cain@mdjwlaw.com*
Robert T. Owen
State Bar No. 24060370
*owen@mdjwlaw.com*
MARTIN, DISIERE, JEFFERSON, & WISDOM, L.L.P.
808 Travis, 20th Floor
Houston, Texas 77002
Telephone: (713) 632-1700
Facsimile: (713) 222-0101

In the trial court, AGCS was represented by the following attorneys:

W. Jackson Wisdom
State Bar No. 21804025
*wisdom@mdjwlaw.com*
James M. Cleary
State Bar No. 00783838
*cleary@mdjwlaw.com*
MARTIN, DISIERE, JEFFERSON, & WISDOM, L.L.P.
808 Travis, 20th Floor
Houston, Texas 77002
Telephone: (713) 632-1700
Facsimile: (713) 222-0101

**APPELLEE/PLAINTIFF**

Schlumberger Technology Corporation

In the trial court and in this appeal, Schlumberger was and is represented by the following attorneys:

Jeff Barnes
State Bar No.: 24045452
*barnesj@jacksonlewis.com*
JACKSON LEWIS P.C.
1415 Louisiana, Suite 3325
Houston, Texas 77002
Telephone: 713-650-0404
Facsimile: 713-650-0405

William L. Davis
State Bar No. 05563800
*davisw@jacksonlewis.com*
JACKSON LEWIS P.C.
500 N. Akard, Suite 2500
Dallas, Texas 75201
Telephone: (214) 520-2400
Facsimile: (214) 520-2008

# TABLE OF CONTENTS

**PAGE**

IDENTITY OF PARTIES AND COUNSEL ........................................................i

TABLE OF CONTENTS............................................................................... iii

TABLE OF AUTHORITIES .........................................................................v

STATEMENT OF THE CASE........................................................................x

STATEMENT REGARDING ORAL ARGUMENT ...............................xi

ISSUES PRESENTED................................................................................ xii

STATEMENT OF FACTS .............................................................................1

SUMMARY OF THE ARGUMENT ...........................................................8

ARGUMENT ...............................................................................................10

I.     THE DISTRICT COURT IMPROPERLY DENIED PARKER AND MYERS' MOTION TO COMPEL ARBITRATION. ................................10

     A.    Standard Of Review ..................................................................10

     B.    The APA Requires Schlumberger's Claims To Be Presented To An Arbitrator. ..........................................................................10

          1.    The arbitrability of the claims against Parker and Myers should be determined by the arbitrator, not a state court judge.....................................................................................10

          2.    The APA's arbitration provision requires each of Schlumberger's claims to be arbitrated. .................................14

               a.    There is a valid agreement to arbitrate. .........................14

               b.    The claims asserted are encompassed by the arbitration agreement. .....................................................15

               c.    Schlumberger is equitably estopped from avoiding arbitration...............................................................23

II.     THE DISTRICT COURT IMPROPERLY GRANTED
        SCHLUMBERGER A TEMPORARY INJUNCTION
        PROHIBITING PARKER AND MYERS FROM WORKING IN
        THE WIRELINE, SLICK-LINE, AND BRAIDED LINE
        INDUSTRY. ..........................................................................................25

        A.      The Temporary Injunction Should Be Reversed To Allow The
                Arbitrator To Adjudicate The Dispute. ...............................................25

        B.      Oklahoma Law Applies To The Non-Compete Agreements. .............26

        C.      The Non-Competition Provisions In The ICN Agreement And
                Retention Bonus Contract Are Void Under Oklahoma Law. ............33

        D.      Even Under Texas Law, The Non-Competition Agreements,
                And The District Court's Temporary Injunction, Are
                Unenforceable Restraints On Trade. ...................................................36

        E.      There Is No Evidence Of Irreparable Harm As Required To
                Support Injunctive Relief. ..................................................................54

CONCLUSION AND PRAYER ..........................................................................56

CERTIFICATE OF COMPLIANCE....................................................................58

CERTIFICATE OF SERVICE ............................................................................58

APPENDICES

# TABLE OF AUTHORITIES

**PAGE**

**Cases**

*Abetter Trucking Co. v. Arizpe*,
113 S.W.3d 503 (Tex. App.—Houston [1st Dist.] 2003, no pet.) ......................55

*Allan J. Richardson & Assocs., Inc. v. Andrews*,
718 S.W.2d 833 (Tex. App.—Houston [14th Dist.] 1986, no writ) ...................46

*Am. Emp'r Ins. Co. v. Aiken*,
942 S.W.2d 156 (Tex. App.—Fort Worth 1997, no writ) .................................14

*Andrews v. Diamond, Rash, Leslie & Smith*,
959 S.W.2d 646 (Tex. App.—El Paso 1997, writ denied)................................13

*Bayly, Martin & Fay, Inc. v. Pickard*,
780 P.2d 1168 (Okla. 1989) .................................................................35

*Borders v. KRLB, Inc.*,
727 S.W.2d 357 (Tex. App.—Amarillo 1987, writ ref'd n.r.e.) .........................55

*Burlington Res. Oil & Gas Co. LP v. San Juan Basin Royalty Trust*,
249 S.W.3d 34 (Tex. App.—Houston [1st Dist.] 2007, pet. denied)...................11

*Butler v. Arrow Mirror & Glass, Inc.*,
51 S.W.3d 787 (Tex. App.—Houston [1st Dist.] 2001, no pet.) ............46, 47, 48

*Butnaru v. Ford Motor Co.*,
84 S.W.3d 198 (Tex. 2002)..................................................................56

*Cardinal Health Staffing Network, Inc. v. Bowen*,
106 S.W.3d 230 (Tex. App.—Houston [1st Dist.] 2003, no pet.) ................56, 57

*Cardoni v. Prosperity Bank.*
2014 WL 4982600 (S.D. Tex. Oct. 6, 2014)......................................................33

*Coinmach Corp. v. Aspenwood Apartment Corp.*,
417 S.W.3d 909 (Tex. 2013).........................................................................37

*Cotton Commercial USA, Inc. v. Clear Creek Indep. Sch. Dist.*,
387 S.W.3d 99 (Tex. App.—Houston [14th Dist.] 2012, no pet.).....................16

*Desantis v. Wackenhut Corp.*,
  793 S.W.2d 670 (Tex. 1990) ...................................................................... passim

*Ellis v. Schlimmer*,
  337 S.W.3d 860 (Tex. 2011) ...................................................................16

*Exxon Mobil Corp. v. Drennen*,
  --- S.W.3d ----, 2014 WL 4782974 (Tex. 2014) ...................................................31

*Forest Oil Corp. v. McAllen*,
  268 S.W.3d 51 (Tex. 2008) ...................................................................10

*Gallahger Healthcare Ins. Servs. v. Vogelsang*,
  312 S.W.3d 640 (Tex. App.—Houston [1st Dist.] 2009, pet. denied)........ passim

*Glassell Producing Co., Inc. v. Jared Res., Ltd.*,
  422 S.W.3d 68 (Tex. App.—Texarkana 2014, no pet.) ...............................16, 22

*Grigson v. Creative Artists Agency, L.L.C.*,
  210 F.3d 524 (5th Cir. 2000) ...................................................................23, 24

*GTE Sw., Inc. v. Bruce*,
  998 S.W.2d 605 (Tex. 1999) ...................................................................52

*Hall v. GE Plastic Pac. PTE Ltd.*,
  327 F.3d 391 (5th Cir. 2003) ...................................................................13

*Hammerly Oaks, Inc. v. Edwards*,
  958 S.W.2d 387 (Tex. 1997) ...................................................................52

*Howard v. Nitro-Lift Technologies, L.L.C.*,
  2011 OK 98, 28 P.3d 20,
  cert. granted, judgment vacated on other grounds,
  133 S. Ct. 500, 184 L. Ed. 2d 328 (2012) ...........................................32

*In re Credit Suisse First Boston Mortg. Capital, L.L.C.*,
  273 S.W.3d 843 (Tex. App.—Houston [14th Dist.] 2008, no pet.) ....................52

*In re FirstMerit Bank, N.A.*,
  52 S.W.3d 749 (Tex. 2001) ...................................................................16

*In re Kellogg Brown & Root, Inc.*,
  166 S.W.3d 732 (Tex. 2005) ...................................................................24, 25

*In re Weekley Homes, L.P.*,
  180 S.W.3d 127 (Tex. 2005)..........................................................................10, 24

*Investors Diversified Servs. v. McElroy*,
  645 S.W.2d 338 (Tex. App.—Corpus Christi 1982, no writ))................47, 51, 52

*J.J. Gregory Gourmet Servs., Inc. v. Antone's Imp. Co.*,
  927 S.W.2d 31 (Tex. App.—Houston [1st Dist.] 1995, no writ)........................26

*John R. Ray & Sons, Inc. v. Stroman*,
  923 S.W.2d 80 (Tex. App.—Houston [14th Dist.] 1996,
  writ denied)....................................................................................39, 41, 42, 44

*Juliette Fowler Homes, Inc., v. Welce Assocs., Inc.*,
  793 S.W.2d 660 (Tex. 1990).............................................................................37

*Marsh USA Inc. v. Cook*,
  354 S.W.3d 764 (Tex. 2011)................................................................. passim

*Martin v. Linen Sys. for Hospitals, Inc.*,
  671 S.W.2d 706 (Tex. App.—Houston [1st Dist.] 1984, no writ)................37, 39

*Maxxim Med., Inc. v. Michelson*,
  51 F. Supp. 2d 773 (S.D. Tex. 1999) .................................................................31

*McNeilus Companies, Inc. v. Sams*,
  971 S.W.2d 507 (Tex. App.—Dallas 1997, no writ) ...................................44, 46

*Meyer v. WMCO-GP, LLC*,
  211 S.W.3d 302 (Tex. 2006).............................................................................23

*Minnesota Min. & Mfg. Co. v. Nishika Ltd.*,
  953 S.W.2d 733 (Tex. 1997).............................................................................29

*My Cafe-CCC, Ltd. v. Lunchstop, Inc.*,
  107 S.W.3d 860 (Tex. App.—Dallas 2003, no pet.)..........................................16

*Nationwide of Bryan, Inc. v. Dyer*,
  969 S.W.2d 518 (Tex. App.—Austin 1998, no pet.) ...................................14, 22

*Neatherlin Homes, Inc. v. Love*,
  2007 WL 700996 (Tex. App.—Corpus Christi Mar. 8, 2007, no pet.) ........23, 24

vii

*Okorafor v. Uncle Sam & Assocs., Inc.*,
   295 S.W.3d 27 (Tex. App.—Houston [1st Dist.] 2009, pet. denied)..................10

*Peat Marwick Main & Co. v. Haass*,
   818 S.W.2d 381 (Tex. 1991) ...............................................................................38, 39

*Pennzoil Exploration & Prod. Co. v. Ramco Energy Ltd.*,
   139 F.3d 1061 (5th Cir. 1998)........................................................17, 18, 21, 22

*Pleasant Glade Assembly of God v. Schubert*,
   264 S.W.3d 1 (Tex. 2008) .......................................................................................12

*Rachal v. Reitz*,
   403 S.W.3d 840 (Tex. 2013) ..................................................................................16

*Recon Exploration, Inc. v. Hodges*,
   798 S. W.2d 848 (Tex. App.—Dallas 1990, no writ) ..........................................44

*Revere Oil Co. v. Bank of Chillicothe,*
   255 S.W. 219 (Tex. Civ. App.—Amarillo 1923, no writ) .................................52

*S. Distrib. Co. v. Carraway*,
   127 S.E. 427 (N.C. 1925)........................................................................................52

*Schlumberger Tech. Corp. v. Baker Hughes Inc.*,
   355 S.W.3d 791 (Tex. App.—Houston [1st Dist.] 2011, no pet.) .............. passim

*Stocks v. Banner Am. Corp.*,
   599 S.W.2d 665 (Tex. Civ. App.—Texarkana 1980, no writ)............................47

*Thompson v. Cont'l Airlines*,
   18 S.W.3d 701 (Tex. App.—San Antonio 2000, no pet.)...................................13

*Totino v. Alexander & Assocs.*,
   1998 WL 552818 (Tex. App.—Houston [1st Dist.] Aug. 20, 1998, no pet.).....47

*Wright v. Sport Supply Group, Inc.*,
   137 S.W.3d 289 (Tex. App.—Beaumont 2004, no pet.) .......................41, 42, 43

**Statutes**

OKLA. STAT. tit. 15
  § 217 (2001) ..................................................................................33, 36

OKLA. STAT. tit. 15
  § 219A (2001) ....................................................................31, 33, 34, 36

TEX. BUS. & COMM. CODE
  § 15.51 ........................................................................................................31

TEX. BUS. & COMM. CODE
  § 15.50 .................................................................................... passim

TEX. CIV. PRAC. & REM. CODE
  § 171.001 ..................................................................................................15

**Other Authorities**

RESTATEMENT (SECOND) OF CONFLICT OF LAWS
  § 187 (1971) ............................................................................................27

W. Wendall Hall et al., *Hall's Standards of Review in Texas*, 42 ST. MARY'S
  L.J. 1, (2010) ..........................................................................................10

## STATEMENT OF THE CASE

| | |
|---|---|
| *Nature of the Case:* | This is an interlocutory appeal of three orders: an order denying Parker and Myers' Motion To Compel Arbitration (C.R. 284); an order denying Parker and Myers' Motion For Reconsideration of that order (C.R. 285); and an order granting temporary injunction enjoining Parker and Myers (C.R. 296-305). |
| *Trial court:* | The Honorable Brady G. Elliot, 268th Judicial District Court of Fort Bend County, Texas. |
| *Course of trial court proceedings:* | Schlumberger sued Ricky Parker and James Myers, alleging that they breached various contracts and committed other torts. C.R. 7-21. Schlumberger also alleges that the district court should permanently enjoin Parker and Myers from competing with it. C.R. 17-20. |

Parker and Myers moved the district court to compel Schlumberger to arbitrate the dispute, which motion the trial court denied. C.R. 160-68, 284. Parker and Myers also moved the district court to reconsider its denial of the motion to compel, which motion the district court also denied. C.R. 277-80, 285.

Schlumberger moved the trial court to sign a temporary injunction barring Parker and Myers from competing with Schlumberger, which injunction the trial court signed following an evidentiary hearing. C.R. 17-20, 296-305

Parker and Myers timely appealed the district court's orders denying their motion to compel and motion for reconsideration of same as well as the district court's order granting Schlumberger's temporary injunction pursuant to sections 51.014(a)(4); 61.016; and 171.098 of the Texas Civil Practice and Remedies Code. C.R. 306-07.

## STATEMENT REGARDING ORAL ARGUMENT

Parker and Myers respectfully suggest that the Court should grant oral argument. This case concerns whether an Asset Purchase Agreement requires the parties to arbitrate a dispute where a party sues a signatory and non-signatory to the Agreement for breach of contracts signed in connection with the agreement and torts connected with the Agreement. This case also concerns whether the district court properly applied Texas law in signing a temporary injunction barring Oklahoma and Arkansas residents from competing with Schlumberger in Oklahoma, and whether the district court's limitations on its temporary injunction are reasonable. Parker and Myers believe that hearing from the parties in person would provide the Court helpful elaboration on the issues, which, as the Court will see, are detailed and particular.

## ISSUES PRESENTED

(1)  Whether the district court erroneously concluded that an Asset Purchase Agreement, which provides that all disputes "arising under or in connection with" the Agreement must be resolved via arbitration, did not require the parties to submit disputes arising in connection with the Agreement to an arbitrator?

(2)  Whether the district court properly enjoined Parker and Myers from competing with Schlumberger where Parker and Myers work primarily in Oklahoma and Schlumberger's covenant-not-to-compete is void and unenforceable under Oklahoma law?

(3)  Whether the district court's injunction is reasonably limited in geography, scope, and time where it bars Parker and Myers from competing with Schlumberger in the entire wireline industry, applies to 142 counties in eight states, and contains no temporal limitation?

(4)  Whether the district court may properly grant Schlumberger injunctive relief where it admits that it has a legal remedy for its claims?

**STATEMENT OF FACTS**

On September 9, 2011, Parker Energy Services Company (now known as Parker Close Out Company) entered into an "Asset Purchase Agreement" ("APA") with Production Wireline and Cased Hole Services Group, LLC, to sell the assets of Parker Energy, an oilfield company offering wireline, slick-line, and braided line services,[1] to Production Wireline. *See* 5 R.R. Defs.' Ex. 1.[2] Schlumberger Technology Corporation is the successor-in-interest, by merger, of Production Wireline. *See* 3 R.R. 81. Appellants Ricky D. Parker and James Myers were employees of Parker Energy, and Parker, in his individual capacity, is a party to the APA. *See* 5 R.R. Defs.' Ex. 1 at 38, 48.

In addition to requiring Parker Energy to transfer its assets to Production Wireline, the APA required that certain employees of Parker Energy, including

---

[1] "Wireline," "slick-line," and "braided line" operations are specialized operations attendant to oil and gas field work. "Wireline" generally refers to a cabling technology used by operators of oil and gas wells to lower equipment or measurement devices into the well for the purposes of well intervention, reservoir evaluation, and pipe recovery. "Slick-line" refers to a single strand wire which is used to run tools into wellbore, and is generally used to lower downhole tools into an oil or gas well to perform maintenance downhole. "Braided line" generally refers to an inner core of insulated wires that provide power to equipment located at the end of the cable and provides a pathway for electrical telemetry for communication between the surface and equipment at the end of the cable. *See* Wikipedia: Wireline (Cabling), *http://en.wikipedia.org/wiki/Wireline_(cabling)* (last visited January 27, 2015); *See also* 2 R.R. 17-18; 2 R.R. 47.

[2] Volume 5 of the reporter's record, which includes the exhibits presented during the temporary injunction hearing and the hearing on Parker and Myers' motion to reconsider the district court's denial of their motion to compel arbitration, is not paginated. Accordingly, Parker and Myers will refer to the various exhibits contained therein by the exhibit number noted by the district court.

Parker and Myers, agree to Production Wireline's "standard employment forms," which included an "Intellectual Property, Confidential Information, and Non-Compete" Agreement ("ICN Agreement"). 5 R.R. Defs.' Ex. 1 at 38 ¶ 9.1(j); 4 R.R. 12-13. The APA also required that Myers agree to a "Retention Bonus Contract," a form which was attached as an exhibit to the APA. 5 R.R. Defs.' Ex. 1 at 38 ¶ 9.1(j), (n). Parker and Myers signed the required forms. *See* 5 R.R. Pl.'s Ex. 1-3.

> The APA includes an arbitration clause requiring that:

> Any controversy, dispute or claim arising under or in connection with this Agreement (including, without limitation, the existence, validity, interpretation or breach hereof and any claim based on contract, tort [or] statute) shall be resolved by a binding arbitration, to be held in Houston, Texas pursuant to the Federal Arbitration Act and in accordance with the then-prevailing Commercial Arbitration Rules of the American Arbitration Association (the <u>AAA</u>").

5 R.R. Defs.' Ex. 1 at 44-45 ¶ 12.3(b).

Parker worked for Schlumberger from September 2011 until October 2, 2013. 2 R.R. 15-16. Myers worked for Schlumberger from September 2011 until September 16, 2014. 2 R.R 33-34. Both Parker and Myers worked for Schlumberger in its Pocola, Oklahoma office with their work primarily focused in Oklahoma, although they did supervise work crews operating in some other states. 3 R.R. 23-24.

2

In the underlying lawsuit, Schlumberger complains that, after leaving its employ in October 2013, Parker purchased trucks and other equipment which could be used to perform wireline, slick-line, and braided line work. C.R. 11-12. It also complains that, on September 17, 2014, eleven and a half months after resigning from Schlumberger, Parker hired Myers and other Schlumberger workers to work for Professional Wireline Services, LLC ("PWL"), a company that would compete with Schlumberger for wireline, slick-line, and braided line work. C.R. 12. PWL performed its first job on September 29, 2014, nearly one year after Parker resigned from Schlumberger. 3 R.R. 69.

Schlumberger contends that such actions violate a covenant not to compete included in the ICN Agreements Parker signed in connection with the APA, which provided:

> Employee agrees for a period of one (1) year following the date of termination of his/her employment with Company, Employee will not directly or indirectly work for or assist (whether as an owner, employee, consultant, contractor or otherwise) any business or commercial operation whose business is – even in part – in direct or indirect competition with any area of the Company's business in which Employee was employed by Company.
>
> . . .
>
> Employee agrees that in order to protect Company Confidential Information, business interests and goodwill, the foregoing restriction on Employee's subsequent employment shall extend to any county, parish, borough, or foreign equivalent: (1) in which Employee had a customer or service assignment for Company in the one-year period preceding Employee's termination; (2) in which Company has

3

customers or service assignments about which Employee obtained Company Intellectual Property during his/her employment with Company; (3) in which Company has a manufacturing site, development site, work site, job site, or offices; and/or (4) in which any business or commercial operation whose business (a) is – even in part – in direct or indirect competition with any area of the Company's business in which Employee was employed by Company or (b) has a manufacturing site, development site, work site, job site, or offices.

C.R. 15-16, 25; 5 R.R. Pl.'s Ex. 1-2 at ¶ 5.

Schlumberger also contends that Myers, who signed an identical agreement, violated the non-compete provision above by (1) communicating with Parker regarding the acquisition of wireline equipment before retiring from Schlumberger (C.R. 11-12); (2) meeting with Schlumberger employees on September 16, 2014 after his resignation to discuss employment opportunities with PWL (C.R. 12); and (3) going to work for PWL on September 17, 2014, the day after he retired from Schlumberger. (*See* C.R. 12-13). Schlumberger also contends that Myers failed to return certain tools to it following his retirement from Schlumberger. *See* C.R. 13. Schlumberger contends such acts also violate a non-compete provision in the Retention Bonus Contract Myers signed, which provides:

As further condition of eligibility for the Bonus Award, and as additional protection for the Company's Confidential Information, Employee agrees that:

(a) During Employee's employment with the Company and for a period of one year following the end of that employment, Employee will not solicit, contact or accept work, which is the same or substantially similar to work and/or services performed by Employee

4

for Company, from clients of Company with whom Employee had business dealings during Employee's employment with the Company;

(b) During Employee's employment by the Company and for a period of one year following the end of that employment, Employee will not provide services (including consulting services), which are the same or substantially similar to services and/or work performed by Employee for Company, to clients of Company with whom Employee had business dealings during Employee's employment with Company;

(c) During Employee's employment with the Company and for a period of one year following the end of that employment, Employee will not solicit, recruit, encourage, hire or assist any other person or entity to solicit, recruit, encourage or hire for employment any other employee or independent contractor to work for a competitor of the Company;

(d) During Employee's employment with the Company and for a period of one year following the end of that employment, Employee will not directly or indirectly own, manage, operate, control, be employed by, be a consultant for, or perform any job functions for, any business that is in competition with Company that is located or performs services within the geographic territory serviced by the Company's offices where Employee has been employed during the one year immediately before the end of Employee's employment with Company or any Affiliate. A "business that is in competition with Company" is defined as a business that provides or offers the same or similar services, goods or material to those offered by Company or any Affiliate for which Employee works or performs services during the term of Employee's employment.

C.R. 15-16; 5 R.R. Pl.'s Ex. 3 at ¶ 5.

On October 29, 2014, Schlumberger sent a demand letter to Parker Close Out Company and Parker alleging that Parker Close Out Company, Parker, and Myers had breached the APA. C.R. 180-81. Schlumberger contended that (1) Parker was continuing to utilize e-mail addresses that had been transferred under

5

the APA; (2) that certain tools had not been transferred as required by the APA; and (3) Parker's hiring of various Schlumberger employees, including Myers, violates the APA. C.R. 180-81. Schlumberger also asserted that "failure to take the steps set forth above will be a breach of . . . the APA . . . [i]f you fail to cure the breaches of the Agreement, the likely next step will be to proceed to arbitration under section 12.3 of the Agreement." C.R. 181. In response to the demand letter, Parker Close Out Company, Parker, in his individual capacity, and Myers, in his individual capacity, filed and served a demand for arbitration with the AAA on November 26, 2014; which arbitration remains pending. C.R. 170-77.

However, despite asserting that Parker's acts constitute breaches of the APA, on October 8, 2014, Schlumberger sued Parker and Myers, in their individual capacities, in the state district court of Fort Bend County, Texas. C.R. 7-21. Schlumberger contends that (1) Parker tortiously interfered with the Retention Bonus Contract and ICN Agreement between Schlumberger and Myers (C.R. 14); (2) Parker and Myers tortiously interfered with Schlumberger's prospective business relations (C.R. 15); (3) Myers breached a fiduciary duty owed to Schlumberger and that Parker aided and abetted that breach of fiduciary duty (C.R. 16-17); and (4) Parker and Myers breached the Retention Bonus Contract and ICN Agreements signed in connection with the APA (C.R. 15-16). Schlumberger also asserts that it is entitled to permanently enjoin Parker and

6

Myers from "soliciting, contacting, or accepting work, which was the same or substantially similar to the work and/or services performed by them for the Company, from clients of the Company with whom they had business dealings during their employment with the Company." C.R. 19.

Parker and Myers moved the district court to compel arbitration as required by the APA. C.R. 160-68. The district court denied the motion on December 10, 2011 ruling:

> The Court finds . . . that Plaintiff in this action is not bringing claims against the Defendants under the APA. The Court also finds that any claims brought under the following agreements are not arbitrable: (1) the Intellectual Property, Confidential Information and Non-Compete Agreement between Plaintiff and Parker dated September 10, 2011, (b) the Intellectual Property, Confidential Information and Non-Compete Agreement between Plaintiff and James Myers ("Myers") dated September 10, 2011, and (c) the Retention Bonus Contract between [Production Wireline] and Myers dated September 15, 2011.

C.R. 284. On December 18, 2014, the district court also granted Schlumberger a temporary injunction providing, in part:

> 6.    Enjoined Parties shall not directly or indirectly work for, or assist (whether as an owner, employee, consultant, contractor or otherwise) any business or commercial operations of wireline, slick line and braided line operations in the counties set forth in Plaintiff's Exhibit 74 which is attached.
>
> 7.    Enjoined Parties shall not solicit, contact, or accept wireline, slick line or braided line work and/or service, from the Established Customers of Schlumberger in the states of Oklahoma, Texas, Arkansas, Kansas, Pennsylvania, and Louisiana.
>
> 8.    Enjoined Parties shall not provide, or supervise, advise, manage, or serve as a consultant for businesses who are performing,

wireline, slick line or braided line work for the Established Customers of Schlumberger in the states of Oklahoma, Texas, Arkansas, Kansas, Pennsylvania and Louisiana.

C.R. 304. Parker and Myers timely filed this interlocutory appeal of the order denying their motion to compel arbitration as well as the district court's temporary injunction on December 22, 2014. C.R. 306-07.

## SUMMARY OF THE ARGUMENT

The district court committed reversible error by failing to stay the proceedings in the underlying lawsuit and compel Schlumberger's claims to arbitration. Parker and Schlumberger's predecessor-in-interest agreed to arbitrate disputes arising under or in connection with the APA. Schlumberger's claims for breach of contracts signed in connection with the APA are encompassed within that arbitration agreement. Further, Schlumberger's tort claims for interference with relationships created by the APA also fall within the arbitration agreement and must be presented to the arbitrator. Moreover, Schlumberger is equitably estopped from avoiding arbitration due to the presence of Myers, a non-signatory defendant, because Schlumberger seeks direct benefits of the APA from Myers and its claims against Myers are substantively intertwined and rest on the same facts as its claims against Parker, a signatory to the arbitration agreement.

The district court also erred by signing an order enjoining Parker and Myers from working in the wireline industry. The evidence in the record establishes that

8

Schlumberger's covenants not-to-compete should have been evaluated under Oklahoma law, which state's public policy renders such covenants void. Further, even assuming the district court properly applied Texas law, which it did not, the district court erred by imposing unreasonable restrictions as to geography, scope, and time in violation of section 15.50 of the Texas Business and Commerce Code. The district court also erred by awarding Schlumberger injunctive relief when the record establishes it has an adequate remedy at law.

## ARGUMENT

## I. THE DISTRICT COURT IMPROPERLY DENIED PARKER AND MYERS' MOTION TO COMPEL ARBITRATION.

### A. Standard Of Review

Generally, this Court reviews a trial court's denial of a motion to compel arbitration for abuse of discretion. *Schlumberger Tech. Corp. v. Baker Hughes Inc.*, 355 S.W.3d 791, 800 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (citing *Okorafor v. Uncle Sam & Assocs., Inc.*, 295 S.W.3d 27, 38 (Tex. App.—Houston [1st Dist.] 2009, pet. denied); W. Wendall Hall et al., *Hall's Standards of Review in Texas*, 42 ST. MARY'S L.J. 1, 78 (2010)). However, when an appeal from a denial of a motion to compel arbitration turns on a legal determination, the court applies a de novo standard. *Forest Oil Corp. v. McAllen*, 268 S.W.3d 51, 55 n. 9 (Tex. 2008).

### B. The APA Requires Schlumberger's Claims To Be Presented To An Arbitrator.

#### 1. The arbitrability of the claims against Parker and Myers should be determined by the arbitrator, not a state court judge.

At the outset, the district court erred by refusing to stay the proceedings and submitting the jurisdictional question to the arbitrator. *See Schlumberger Tech. Corp.*, 355 S.W.3d at 802. While the general rule under Texas law is that questions of arbitrability are to be resolved by a court, *see In re Weekley Homes, L.P.*, 180 S.W.3d 127, 130 (Tex. 2005), this Court recognizes that "*the express*

10

*incorporation of rules that empower the arbitrator to determine arbitrability—such as the [American Arbitration Association] Commercial Arbitration Rules—has been held to be clear and unmistakable evidence of the parties' intent to allow the arbitrator to decide such issues.*" *Schlumberger Tech. Corp.*, 355 S.W.3d at 802 (*citing Burlington Res. Oil & Gas Co. LP v. San Juan Basin Royalty Trust,* 249 S.W.3d 34, 39-41 (Tex. App.—Houston [1st Dist.] 2007, pet. denied)) (emphasis added).

As in *Schlumberger v. Baker Hughes*, the APA incorporates the Commercial Arbitration Rules of the American Arbitration Association ("AAA"). 5 R.R. Defs.' Ex. 1 at 45 ¶ 12.3(b) ("Any controversy, dispute or claim arising under or in connection with this Agreement . . . shall be resolved by a binding arbitration . . . *in accordance with the then prevailing Commercial Arbitration Rules of the American Arbitration Association.*") (emphasis added). The AAA Commercial Arbitration Rules provide:

> The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim.

COMMERCIAL ARBITRATION RULES OF THE AMERICAN ARBITRATION ASSOCIATION, Rule 7(a) (2014). This Court recognizes that, where an arbitration agreement incorporates the AAA rules, and no provision negates an arbitrator's power under AAA Rule 7(a) to determine the scope of the arbitration, the arbitrator must be

11

allowed to determine arbitrability. *Schlumberger Tech. Corp.*, 355 S.W.3d at 803. There are no provisions in the APA that negate an arbitrator's power under AAA Rule 7(a) to determine the scope of the arbitration. Accordingly, the arbitrator, not the district court, had the exclusive authority to decide whether Schlumberger's claims were arbitrable. *See id.* The district court erred by failing to stay its proceedings to allow the arbitrator to decide the proper scope of the arbitration, usurping the arbitator's agreed upon authority to make such a decision. *Id.*

Indeed, that the arbitrator had such authority should have been readily apparent to Schlumberger as it has, in the past, argued to this Court that an arbitrator, not a state court judge, has the exclusive right to resolve questions of arbitrability where the arbitration agreement provides the arbitrator with such authority. *Schlumberger Tech. Corp.*, 355 S.W.3d at 802-03. Schlumberger's prior position before this Court, with which this Court properly agreed, precludes it from taking a contrary position in this matter pursuant to the doctrine of judicial estoppel.

Judicial estoppel "precludes a party from adopting a position inconsistent with one that it maintained successfully in an earlier proceeding." *Pleasant Glade Assembly of God v. Schubert*, 264 S.W.3d 1, 6 (Tex. 2008). Its essential function "is to prevent the use of intentional self-contradiction as a means of obtaining unfair advantage." *See Andrews v. Diamond, Rash, Leslie & Smith*, 959 S.W.2d

12

646, 650 (Tex. App.—El Paso 1997, writ denied); *Hall v. GE Plastic Pac. PTE Ltd.*, 327 F.3d 391, 396 (5th Cir. 2003) (noting basis for judicial estoppel is the assertion of a position clearly inconsistent with a previous position accepted by the court). "The policies underlying the doctrine include preventing internal inconsistency, precluding litigants from playing fast and loose with the courts, and prohibiting parties from deliberately changing positions according to the exigencies of the moment." *Thompson v. Cont'l Airlines*, 18 S.W.3d 701, 703 (Tex. App.—San Antonio 2000, no pet.).

In its prior case before this Court, Schlumberger asserted that an arbitrator has the exclusive right to determine the jurisdiction of the arbitration where the arbitration agreement incorporates the AAA commercial arbitration rules, as the APA does in this case. *See Schlumberger Tech. Corp.*, 355 S.W.3d at 803. This Court agreed with Schlumberger, holding that "the trial court should have granted . . . Schlumberger's motion [to compel arbitration] so that the dispute could be resolved by the AAA panel." *Id.* Accordingly, having previously asserted a (correct) position with which this Court agreed, Schlumberger is judicially estopped from asserting that a state court judge, rather than the arbitrator, is the proper person to determine the jurisdictional scope of the arbitration. *See Thompson*, 18 S.W.3d at 703.

As the APA provides the arbitrator with exclusive authority to determine arbitrability, and Schlumberger is judicially estopped to contest this issue, the Court should reverse the district court's denial of Parker and Myers' motion to compel arbitration, stay the proceedings in the underlying litigation, and allow the arbitrator the opportunity to rule regarding the scope of its jurisdiction. *See Schlumberger Tech. Corp.*, 355 S.W.3d at 802-03.

**2.    The APA's arbitration provision requires each of Schlumberger's claims to be arbitrated.**

Even assuming for the sake of argument that the district court could properly preclude the arbitrator from adjudicating the scope of the arbitration, which it cannot, the APA requires each of Schlumberger's claims to be arbitrated. District courts are required to grant motions to compel arbitration where (1) there is a valid arbitration and (2) the agreement encompasses the claims presented. *Nationwide of Bryan, Inc. v. Dyer*, 969 S.W.2d 518, 520 (Tex. App.—Austin 1998, no pet.). "In Texas, every reasonable presumption must be decided in favor of arbitration." *Id.* "Once a party to a suit comes forward with a presumptively valid arbitration agreement, the court must order the parties to arbitrate." *Id.*

**a.    There is a valid agreement to arbitrate.**

Whether a valid arbitration agreement exists is a question of law. *Am. Emp'r Ins. Co. v. Aiken*, 942 S.W.2d 156, 159 (Tex. App.—Fort Worth 1997, no writ). "A written agreement to arbitrate is valid and enforceable if the agreement is

14

to arbitrate a controversy that: (1) exists at the time of the agreement; or (2) arises between the parties after the date of the agreement." TEX. CIV. PRAC. & REM. CODE § 171.001.

Production Wireline (Schlumberger's predecessor-in-interest), Parker Energy, and Parker each entered into the APA, a written contract including an agreement to arbitrate all disputes "arising under or in connection with" the APA. 5 R.R. Defs.' Ex. 1 at 45 ¶ 12.3(b). The written arbitration agreement meets the enforceability requirements under Texas law and constitutes a valid agreement to arbitrate. *See* Tex. Civ. Prac. & Rem. Code § 171.001.

### b. The claims asserted are encompassed by the arbitration agreement.

Despite the agreement to arbitrate, the district court denied the motion to compel arbitration because it concluded that Schlumberger's claims under the Retention Bonus Contracts and ICN Agreements signed in connection with the APA, were "separable" from the APA, concluding: "Plaintiff in this action is not bringing any claims against the Defendants under the APA." C.R. 284; 3 R.R. 7. Such analysis, however, fails to apply the proper legal standards relative to a motion to compel arbitration.

The supreme court instructs that, when determining whether a claim falls within the scope of an arbitration agreement, a court must look to the factual allegations asserted, not the legal claims. *Rachal v. Reitz*, 403 S.W.3d 840, 850

15

(Tex. 2013); *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 754 (Tex. 2001) ("To determine whether a party's claims fall within an arbitration agreement's scope, we focus on the complaint's factual allegations rather than the legal causes of action asserted."). A claim is not subject to arbitration "only if the facts alleged in support of the claim are *completely independent of the contract and the claim could be maintained without reference to the contract*." *Glassell Producing Co., Inc. v. Jared Res., Ltd.*, 422 S.W.3d 68, 77 (Tex. App.—Texarkana 2014, no pet.) (emphasis added) (citing *Cotton Commercial USA, Inc. v. Clear Creek Indep. Sch. Dist.*, 387 S.W.3d 99, 108 (Tex. App.—Houston [14th Dist.] 2012, no pet.)). Courts should resolve doubts as to the agreement's scope in favor of arbitration. *Ellis v. Schlimmer*, 337 S.W.3d 860, 862 (Tex. 2011).

The APA requires that "[a]ny controversy, dispute or claim *arising under or in connection* with this Agreement (including, without limitation, the existence, validity, interpretation or breach hereof *and any claim based on contract, tort [or] statute*) shall be resolved by a binding arbitration." 5 R.R. Defs.' Ex. 1 at 44-45 ¶ 12.3(b) (emphasis added). Texas courts recognize that the term "arising under or in connection with" is broad in scope and must be given a broad construction. *See My Cafe-CCC, Ltd. v. Lunchstop, Inc.*, 107 S.W.3d 860, 866 (Tex. App.—Dallas 2003, no pet.) (construing term "any dispute arising under or in connection with" broadly as encompassing any dispute connected to or relating to the agreement);

16

*Pennzoil Exploration & Prod. Co. v. Ramco Energy Ltd.*, 139 F.3d 1061, 1067–68 (5th Cir. 1998) (noting, in context of arbitration clauses, "in connection with" language is broad and dispute need only "touch" matters covered by the contract to fall within scope of arbitration agreement). Looking to the facts alleged, each of Schlumberger's asserted claims "arises under" or "in connection with" the APA.

Schlumberger asserts six claims against Parker and Myers alleging (1) Parker breached the ICN Agreement and Myers breached the Retention Bonus Contract and ICN Agreement (C.R. 16); (2) Parker tortiously the Retention Bonus Contract and ICN Agreement between Production Wireline and Myers (C.R. 14); (3) Parker and Myers tortiously interfered with Schlumberger's prospective business relationships with third parties (C.R. 15); (4) Myers breached his fiduciary duty to Schlumberger by working for a competing business; and (5) that Parker, "as a result of his knowledge of the terms of the APA," knowingly "aided and abetted" Myers' breaches of fiduciary duty (C.R. 16-17).

The facts supporting each of these claims arise under or in connection with the APA; any dispute regarding them must be resolved by arbitration.

The APA required, as conditions precedent to closing:

(j) [E]ach of the Transferred Employees shall have executed and delivered Purchaser's standard employment documentation for new hires;

* * *

17

(n) . . . James O. Myers . . . shall have executed and delivered to Purchaser a retention bonus contract substantially in the form of Exhibit C hereto (the "Retention Bonus Contract").

5 R.R. Defs.' Ex. 1 at 38, ¶ 9.1 (emphasis in original). Parker and Myers qualify as "Transferred Employees" under the APA, and the evidence in the record shows that the ICN Agreements they signed are part of Schlumberger's "standard employment documentation" referenced by the APA. *See* 4 R.R. 13. Myers' execution of the retention bonus agreement was also an express condition to the APA, and a form retention bonus contract was included as an exhibit to the APA. 5 R.R. Defs.' Ex. 1 at 38, ¶ 9.1. As the Retention Bonus Contract and ICN Agreements are ancillary to the APA, and Parker and Myers agreement to those contracts were, in fact, required by the APA, any dispute regarding the Retention Bonus Contract or ICN Agreements necessarily "arises under or in connection with" the APA. Schlumberger's claims for breach of the Retention Bonus Contract and ICN Agreements, therefore, are encompassed within the APA's arbitration provision and those claims must be compelled to arbitration pursuant to Texas law. *See Pennzoil Exploration & Prod. Co.*, 139 F.3d at 1068 (compelling claims to arbitration where claim is based upon a subsequent letter agreement ancillary to the agreement containing the arbitration clause).

Indeed, the fact that Schlumberger's claims are not "completely independent" of the APA as required to avoid arbitration is confirmed by

18

Schlumberger's conduct before and after it filed the underlying lawsuit. This is clear from a comparison of Schlumberger's pre-suit demand letter to Parker alleging that he had breached the APA and its petition in this case, under which the factual allegations supporting the alleged violation of the APA asserted in the demand letter are the same facts that Schlumberger now says support its tort and contract claims in the underlying lawsuit:

| Demand Letter | Petition |
|---|---|
| With respect to Purchased Intellectual Property . . . We have learned that your new business is using a deceptively similar name to the trade name you sold in the Asset Purchase Agreement. C.R. 180 | The business name used by [Parker and Myers], 'PW' and 'Professional Wireline' is similar to the name used by Schlumberger – Production Wireline. C.R. 13. |
| With respect to the tool boxes in the truck used by Mr. Myers, those were Purchased Assets . . . of the Agreement and must be returned along with all of the tools contained in the boxes." C.R. 181 | Schlumberger also found that Schlumberger property was missing and made a demand for the return of the property. Some of the property has been returned, but other property is still under investigation. C.R. 13. |
| A large portion of the purchase price was allocated to goodwill. Demand is hereby made that you cease all activities which interfere with Schlumberger receiving the full value of the goodwill purchased from you. This would include making sure that James Myers [and others] comply with their obligations under their agreements they signed which were referenced in the APA. C.R. 181 | Ricky Parker knew that James Myers entered into the Retention Bonus Agreement and the ICN Agreement. He willfully and intentionally interfered with these agreements. C.R. 14 <br><br> As a result of his knowledge of the terms of the APA, Ricky Parker knew that James Myers had a fiduciary duty . . . to Schlumberger following the acquisition . . . Ricky Parker aided and abetted James Myers in breaching James |

| | Myers' duty of loyalty and his fiduciary duties as set forth in more detail above. C.R. 16-17 |
|---|---|

The fact that Schlumberger's claims are not completely independent from the APA is also readily apparent from its repeated reference to the APA in its petition. *See* C.R. 8 ("*Having signed the APA*, Ricky Parker was put on notice of paragraph 9.1(n) which required that employees James O. Myers . . . execute Retention Bonus Contracts."); C.R. 8 ("*The APA further put Ricky Parker on notice* that he . . . would have to agree to Schlumberger's policies and agreements."); C.R. 10 ("*As contemplated by the APA*, on September 15, 2011, James Myers signed a Retention Bonus Contract."); C.R. 13 ("Schlumberger also found that Schlumberger property was missing and made a demand for the return of the property."); C.R. 16 *("[A]s a result of his knowledge of the terms of the APA*, Ricky Parker knew that James Myers had a fiduciary duty and duties of loyalty to Schlumberger following the acquisition.").

Moreover, Schlumberger has repeatedly acknowledged in its filings in the district court and this Court that the Retention Bonus Contract and ICN Agreements were signed "in connection with" the APA and are "ancillary" to the APA. *See* C.R. 18 (Application For Injunction) ("[Parker and Myers] were paid substantial sums of money in connection with the sale of the business [the APA] and *ancillary* Retention Bonus Agreement . . . ."); Appellee's Response To

20

Appellant's Emergency Motion To Stay Trial Court Order at p. 2 ("*In connection with the sale*, Parker and Myers . . . signed separate Intellectual Property, Confidential Information, and Non-Compete Agreements . . . Additionally Myers signed a Retention Bonus Agreement wherein he was paid a substantial amount of money *in connection with the sale of the business* and his agreement to remain employed for a period of two years after he signed the agreement."). Accordingly, as even Schlumberger admits that the ICN Agreement and Retention Bonus Contract were signed "in connection with" the APA (*See* Appellee's Response To Appellant's Emergency Motion To Stay Trial Court Order at p. 2), any dispute for breach of those agreements necessarily touches upon the APA and must be compelled to arbitration. *See Pennzoil Exploration & Prod. Co.*, 139 F.3d at 1068.

The torts asserted by Schlumberger also "arise under or in connection with" the APA and must be compelled to arbitration. Each of the alleged torts concerns relationships created by the APA and those agreements ancillary to it. *See* C.R. 7-17. For example, the alleged claims for tortious interference with the Bonus Retention Contract and ICN Agreement and breach of fiduciary duty claim arise out of the employment relationship between Schlumberger and Myers. *See* C.R. 16. This relationship was expressly created by the APA because Myers is a "Transferred Employee," *i.e.*, an employee transferred between Parker Energy and Schlumberger pursuant to the APA. 5 R.R. Defs.' Ex. 1 at 35-36 ¶ 8.1, 37 ¶

21

9.1(n). Such claims, indisputably, "touch upon" the APA and are connected with that agreement. *Pennzoil Exploration & Prod. Co.*, 139 F.3d 1068; *Glassell Producing Co., Inc.*, 422 S.W.3d at 77.

Likewise, Schlumberger's claims for tortious interference with its prospective business relationships also concern the relationships created by the APA. Schlumberger contends that, by hiring other former Parker Energy employees, Parker and Myers tortiously interfered with Schlumberger's prospective business relationships because "staffing projects being performed for customers with key personnel is essential for Schlumberger to maintain its relationships." C.R. 15. Such relationships, both between Schlumberger and the former Parker Energy employees, as well as between Schlumberger and Parker Energy's customers, however, were created by the APA. *See* C.R. 15, 5 R.R. Defs.' Ex. 1 at 8 ¶ 2.1. Therefore, the alleged interference with prospective business relationships tort also touches upon the APA and should be compelled to arbitration. *Pennzoil Exploration & Prod. Co.*, 139 F.3d 1068. As the APA's arbitration agreement encompasses each of Schlumberger's claims, the dispute, in its entirety, should be compelled to binding arbitration and the proceedings in the district court stayed. *See Nationwide of Bryan, Inc.*, 969 S.W.2d at 520.

### c. Schlumberger is equitably estopped from avoiding arbitration.

Pursuant to the doctrine of equitable estoppel, "a defendant-signatory to an arbitration agreement [can] compel arbitration with a plaintiff-signatory." *Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 526 (5th Cir. 2000); *see also Meyer v. WMCO-GP, LLC,* 211 S.W.3d 302, 307 (Tex. 2006) (applying equitable estoppel to compel arbitration against signatory-plaintiff); *see also Neatherlin Homes, Inc. v. Love*, 2007 WL 700996, at *4 (Tex. App.—Corpus Christi Mar. 8, 2007, no pet.) (applying equitable estoppel to compel arbitration where "[signatory to arbitration agreement] brought the same causes of action against [signatory and non-signatory to agreement] and alleged concerted, coordinated acts by these parties, and all of [signatory-plaintiff's]  causes of action arise from the same operative facts concerning the allegedly defective construction of her home.")

Equitable estoppel allows a nonsignatory to compel arbitration in two different circumstances: "[f]irst, equitable estoppel applies when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against the nonsignatory . . . [s]econd, application of equitable estoppel is warranted when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract." *Grigson*, 210 F.3d at 527.  In other words, equitable

23

estoppel to compel arbitration is proper where the claims against a signatory to an arbitration agreement and the claims against a non-signatory are intertwined, otherwise the arbitration provision between the two signatories would be rendered meaningless and the public policy in favor of arbitration would be subverted. *See id.*

Here, for the reasons noted above, it is indisputable that Schlumberger's claims against Parker arise under and are connected with the APA. Likewise, as the facts supporting Schlumberger's claims against Myers are the same facts supporting its claims against Parker (*see* C.R. 7-17), the claims against Parker and Myers are substantively intertwined such that Schlumberger is equitably estopped from avoiding its agreement to arbitrate the dispute by suing Myers, a non-signatory to the agreement. *See Neatherlin Homes*, 2007 WL 700996, at *4.

In the district court, Schlumberger contended that the supreme court had overruled the equitable estoppel doctrine with respect to non-signatories. It has not. The supreme court has noted that an estoppel theory remains applicable where there are intertwined facts and a signatory-plaintiff seeks a direct benefit from a contract containing an arbitration agreement from a non-signatory defendant. *See In re Merrill Lynch Trust Co. FSB*, 235 S.W.3d 185, 191 (Tex. 2007); *see also In re Weekley Homes, L.P.*, 180 S.W.3d at 131–32; *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 741 (Tex. 2005). As noted above, Schlumberger seeks numerous

direct benefits from the Myers including damages for loss of goodwill allegedly caused by various torts connected with the APA and injunctive relief pursuant to contracts signed in connection with the APA. *See* C.R. 14-20; *see also* 4 R.R 93-99.

Accordingly, the district court erred by declining to compel arbitration of the related, intertwined claims asserted in Schlumberger's petition, which all arise under or are connected with the APA. The district court's order denying Parker and Myer's motion to compel arbitration should be reversed and the state court proceedings stayed to allow the claims to be presented to binding arbitration in compliance with the APA's arbitration provision. *Id.*

## II. THE DISTRICT COURT IMPROPERLY GRANTED SCHLUMBERGER A TEMPORARY INJUNCTION PROHIBITING PARKER AND MYERS FROM WORKING IN THE WIRELINE, SLICK-LINE, AND BRAIDED LINE INDUSTRY.

### A. The Temporary Injunction Should Be Reversed To Allow The Arbitrator To Adjudicate The Dispute.

For the reasons noted above, each of Schlumberger's claims "arise under or in connection with" the APA such that the claims should be compelled to arbitration. Moreover, as Schlumberger's claims for injunctive relief rely upon the same facts as its claims for damages (*see* C.R. 18), and there is no provision in the APA prohibiting the arbitrator from granting injunctive relief, the arbitrator, as opposed to the district court, should have been afforded the opportunity to address

those claims as well. *See J.J. Gregory Gourmet Services, Inc. v. Antone's Imp. Co.*, 927 S.W.2d 31, 36 (Tex. App.—Houston [1st Dist.] 1995, no writ) (holding that arbitrators have authority to grant injunctive relief in the absence of any language specifically prohibiting the arbiters from same). Accordingly, this Court should reverse the district court's injunction to allow the arbitrator to adjudicate the dispute as required by the APA. *See id.*

## B.     Oklahoma Law Applies To The Non-Compete Agreements.

Even assuming for the sake of argument the district court could properly adjudicate Schlumberger's application for temporary injunction, which it cannot, the district court committed numerous reversible errors in granting Schlumberger's application. First and foremost, the district court erred in applying Texas rather than Oklahoma law to the covenants not to compete.

The APA, as well as the ancillary Retention Bonus Contract and ICN Agreements, contain choice of law provisions designating Texas law to apply to any dispute. *See* 5 R.R. Pl.'s Ex. 1 at ¶ 17; 5 R.R. Pl.'s Ex. 2 at ¶ 17; 5 R.R. Pl.'s Ex. 3 at ¶ 11; 5 R.R. Defs.' Ex. 1 at 46 ¶ 12.5. However, the Texas Supreme Court has imposed limits to a contracting party's ability to choose the jurisdictional law applying to contracts, noting that parties "*cannot by agreement thwart or offend the public policy of the state the law of which ought otherwise to apply.*" *Desantis v. Wackenhut Corp.*, 793 S.W.2d 670, 677 (Tex. 1990) (emphasis added). In

26

effectuating this policy, the supreme court adopted section 187 of the Restatement

of the Conflict of Laws, which provides:

> (2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either
>
>> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
>>
>> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

*Desantis*, 793 S.W.2d at 677-78 (citing RESTATEMENT (SECOND) OF CONFLICT OF

LAWS § 187 (1971)).

Parker and Myers have not asserted that Texas has no substantial

relationship to the parties, and do not so assert in this appeal. Accordingly, the

choice of law issue turns on whether the application of Texas law would be

contrary to the fundamental policy of a state that has a materially greater interest.

*Id.* Distilling the rules set forth in the restatement, the supreme court instructs that

the following three-prong test applies to such an issue:

> (1)    whether a state has a more significant relationship with the parties and their transaction than the state they chose;
>
> (2)    whether that state has a materially greater interest than the chosen state in deciding whether the agreement should be enforced; and

(3)     whether that state's fundamental policy would be contravened by the application of the law of the chosen state.

*Desantis*, 793 S.W.2d at 678. Applying the supreme court's three prong test, Oklahoma, not Texas, law should apply to the non-compete agreements.

*Oklahoma has a more significant relationship to the non-compete agreements and enjoined parties than Texas*.

To determine what state has the "more significant relationship" to a contractual agreement, the Court should consider the following factors:

(a)     the place of contracting;

(b)     the place of negotiation;

(c)     the place of performance;

(d)     the location of the contract's subject matter; and

(e)     the parties' domicile, residence, nationality, place of incorporation, and place of business.

*Desantis*, 793 S.W.2d at 678, n. 2; *Minnesota Min. & Mfg. Co. v. Nishika Ltd.*, 953 S.W.2d 733, 735-36 (Tex. 1997).  Considering the factors set forth above shows that Oklahoma, not Texas, has the more significant relationship to the non-compete agreements Schlumberger seeks to enforce and the enjoined parties.

Parker negotiated the sale of Parker Energy and the ancillary agreements necessary to complete the sale primarily in Oklahoma.  *See* 3 R.R. 55.  After execution of the APA, both Parker and Myers then went to work for Schlumberger

28

in its Pocola, Oklahoma office and worked for it primarily in Oklahoma. *See* 3 R.R. 25.

Moreover, by seeking to enjoin Parker and Myers from working for P.W.L., an Oklahoma business entity, the non-compete provisions will be fully performed in Oklahoma. P.W.L. is located in Oklahoma, and Oklahoma is the only state where P.W.L. has performed any wireline operations. *See* 3 R.R. 56-58. Myers is also a resident of Oklahoma, while Parker is a resident of Arkansas who lives seven to eight miles from P.W.L.'s offices in Oklahoma. 3 R.R. 23, 56-58. While Parker and Myers acknowledge that the APA was signed in Texas (3 R.R. 55), that Schlumberger has offices in Texas (3 R.R. 23), and that Parker and Myers, while working for Schlumberger, supervised some Schlumberger workers working in Texas (*see, e.g.,* 3 R.R. 52-53), the record reflects that Oklahoma has a more significant relationship to the non-compete provisions and the enjoined parties than Texas. *See Desantis*, 793 S.W.2d at 678. Indeed, the substantive effect of the district court's injunction has been to stop an Oklahoma company's employees (one of which is an Oklahoma resident) from working for it in Oklahoma; in such instances the Texas Supreme Court has held that the state where the work is enjoined has the more substantive relationship to the non-compete and parties. *See id.* (holding that where employee lived and worked in Texas, Texas had a more

29

significant relationship to employee and non-complete provision than the foreign state whose law the employer had chosen to apply to the non-compete provision)

> *Oklahoma has a materially greater interest than Texas in deciding whether the non-compete agreement should be enforced.*

Where an employer seeks to enforce a non-compete agreement against a former employee in another state, the state where the employee works has a materially greater interest in deciding whether the non-compete agreement should be enforced over the contractually chosen jurisdiction. *See Desantis*, 793 S.W.2d at 679; *see also Exxon Mobil Corp. v. Drennen*, --- S.W.3d ----, 2014 WL 4782974 at *6 (Tex. 2014). For example, in *Desantis*, the supreme court held that where the issue was "whether a Texas resident can leave one Texas job to start a competing Texas business," Texas had a materially greater interest than a foreign national employer that had chosen Florida as the law to govern a non-compete agreement. *Desantis*, 793 S.W.2d at 679; *see also Maxxim Med., Inc. v. Michelson*, 51 F. Supp. 2d 773, 781 (S.D. Tex. 1999), *rev'd on other grounds*, 182 F.3d 915 (5th Cir. 1999) (holding that when an employee involved is from a certain state and that state has a strong public policy against non-competition agreements, that state has a materially greater interest in the enforceability of the non-compete agreement). Schlumberger seeks to enforce a non-competition agreement against two employees that worked for it in its Pocola, Oklahoma office, and indisputably, worked and work primarily in Oklahoma. *See* 3 R.R. 56-58. Further, it seeks to enjoin those employees from

30

working for their new Oklahoma employer in Oklahoma. *See* 3 R.R. 56-58. The evidence establishes that Oklahoma has a materially greater interest than Texas in the enforceability of the non-compete agreements. *See Desantis*, 793 S.W.2d at 679.

### *Application of Texas law would contravene the public policy of Oklahoma.*

Under Oklahoma law, an employee has the affirmative right to "engage in the same business as that conducted by the former employer or in a similar business as that conducted by the former employer" and any non-compete that purports to restrict that right "shall be void and unenforceable." OKLA. STAT. tit. 15 § 219A (2001). Schlumberger, however, is using its non-competes to prohibit Parker and Myers, its former employees, from competing with it in a similar business, which violates the public policy of Oklahoma. *See id.*

Application of Texas law would contravene this public policy. Under Texas law, courts have the authority to reform non-competition clauses to make them enforceable. Tex. Bus. & Comm. Code § 15.51. Indeed, Schlumberger specifically requested that the district court reform its exceedingly broad non-compete agreements to make them enforceable. *See* C.R. 19. The district court did so by crafting some, albeit unreasonably broad, limitations to its temporary injunction that are not included in Schlumberger's non-competes. *Compare* C.R. 304 *with* 5 R.R. Pl.'s Ex. 1-3. Oklahoma, however, does not permit such

31

reformation; under Oklahoma law, if a non-compete clause contains restrictions prohibited by Oklahoma public policy, the non-compete agreement is simply void. OKLA. STAT. tit. 15 § 219A(A), (B) (2001). Courts are prohibited from reforming unenforceable agreements. *See Howard v. Nitro-Lift Technologies, L.L.C.*, 2011 OK 98, ¶ 28, 273 P.3d 20, 30, cert. granted, judgment vacated on other grounds, 133 S. Ct. 500, 184 L. Ed. 2d 328 (2012) (holding that Oklahoma courts may not reform non-compete agreements that violate section 219A). Accordingly, the application of Texas law, which permits reformation of covenants not to compete containing unenforceable limitations on a person's constitutional right to work, would contravene the Oklahoma public policy prohibiting such reformation, and Oklahoma law should apply. *See Desantis*, 793 S.W.2d at 679.

Such analysis comports with Judge Gray Miller's recent analysis of identical issues in *Cardoni v. Prosperity Bank*. 2014 WL 4982600 (S.D. Tex. Oct. 6, 2014). In *Cardoni*, an employer sought to enforce a non-competition provision in which the parties had contractually agreed was governed by Texas law. *Id.* at *2. After applying the conflicts of laws principals set forth above, Judge Miller concluded that, despite the choice of law provision, the court was required to apply Oklahoma law to the non-competition agreement. *Id.* at * 12-13. Judge Miller reasoned that the provisions in the agreement exceeded the bounds of Oklahoma law and unreasonably restrained fair competition. *Id.* at *13. Judge Miller concluded that,

where the agreement prohibited the employee from "engaging in any business similar to that of [the former employer] or any business in which [the former employer] may prospectively become engaged," the non-competition agreement violated the mandatory language of section 219A and required the application of Oklahoma law. *Id.* This Court should apply the same analysis as Judge Miller and look to Oklahoma law to judge the enforceability of Schlumberger's non-compete covenants. *See id.* at *13.

C. **The Non-Competition Provisions In The ICN Agreement And Retention Bonus Contract Are Void Under Oklahoma Law.**

Oklahoma law provides that non-competition agreements are void and unenforceable, except in very limited circumstances. OKLA. STAT. tit. 15 § 219A (2001) (declaring "void and unenforceable" any contract between employer and employee that restricts an employee from conducting the "same" or "similar" business as employer); *see also* OKLA. STAT. tit. 15 § 217 (2001) (declaring void, except in limited circumstances, every contract by which anyone is restrained from carrying on a lawful profession or business). The non-competition provision of the ICN Agreements and Retention Bonus Contract violate the public policy of Oklahoma as set forth in these statutes.

The ICN Agreements state that the employee will not "directly or indirectly work for or assist (whether as owner, employee, consultant, contractor, or otherwise) any business or commercial operation whose business is – even in part

33

– in direct competition with any area of the Company's business in which Employee was employed by Company." 5 R.R. Pl.'s Ex. 1-2 at ¶ 5. The Retention Bonus Contract similarly provides that the employee will not "directly or indirectly own, manage, operate, control, be employed by, be a consultant for, or perform any job functions for, any business that is in competition with Company." 5 R.R. Pl.'s Ex. 3 at ¶ 5. A "business that is in competition with Company" is defined as "a business that provides or offers the same or similar services, goods or material to those offered by Company." *Id.* The non-competition provisions of these contracts violate Oklahoma law because they do not allow Parker and Myers to "engage in the same business as that conducted by the former employer or in a similar business as that conducted by the former employer." OKLA. STAT. tit. 15 § 219A (2001). Therefore, as required by section 219A, the Court should conclude that the non-competition provisions Schlumberger seeks to enforce against Parker and Myers are void and unenforceable. *Howard*, 2011 OK 98, ¶ 19 (noting that where a covenant not to compete "prevent[s] the employees from taking jobs in any capacity from a competing business" it violates Oklahoma public policy and is void).

Furthermore, the district court's temporary injunction modifying and restricting the scope of the non-competition provisions violates Oklahoma public policy prohibiting reformation of non-competition provisions when such

34

reformation requires the court to materially alter the provisions at issue. *Bayly, Martin & Fay, Inc. v. Pickard*, 780 P.2d 1168, 1175 (Okla. 1989) (forbidding courts from modifying non-competition provisions to bring them within the rule of reason if the provisions require "material judicial alteration" of essential terms). Under Oklahoma law, judicial modification of non-competes is not appropriate if "the contractual provisions would have to be substantially rewritten to cure multiple defects." *Howard*, 2011 OK 98, ¶ 3. The non-competition provisions in the ICN Agreements cannot be properly reformed under Oklahoma law as the contracts prevent Parker and Myers from directly or indirectly working for or assisting "(whether as owner, employee, consultant, contractor, or otherwise) any business or commercial operation whose business is – even in part – in direct competition with any area of the Company's business in which Employee was employed by Company." 5 R.R. Pl.'s Ex. 1-2 at ¶ 5. The Retention Bonus Contract also requires substantial reformation because, it prevents Myers from directly or indirectly working, managing, operating, controlling, being employed by, being a consultant for, or performing any job functions for "any business that is in competition with Company." 5 R.R. Pl.'s Ex. 3 at ¶ 5. Because it is against Oklahoma public policy to prohibit workers in Oklahoma from "exercising a lawful profession," except in limited circumstances not applicable here, the non-

35

competition agreements at issue violate Oklahoma public policy and are void and unenforceable. OKLA. STAT. tit. 15 §§ 217, 219A (2001).

The district court erred in refusing to apply Oklahoma law rendering Schlumberger's non-competition covenants void. The temporary injunction should be reversed for this reason.

**D.** **Even Under Texas Law, The Non-Competition Agreements, And The District Court's Temporary Injunction, Are Unenforceable Restraints On Trade.**

Even though the Court should apply Oklahoma law in evaluating the enforceability of the non-competition agreements, even under Texas law the agreements, and the district court's injunction, constitute unreasonable restraints on trade. Covenants not to compete are restraints on trade and unenforceable as a matter of public policy unless they are reasonable restraints. *See Juliette Fowler Homes, Inc., v. Welce Assocs., Inc.*, 793 S.W.2d 660, 662 (Tex. 1990) *superseded on other grounds by statute as stated in Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013); *see also* TEX. BUS. & COMM. CODE § 15.50(a). Indeed, as this Court recognizes, "[c]ovenants against competition are generally not favored by our courts because of the public policy against restraints of trade and the hardships resulting from interference with a person's means of livelihood." *Martin v. Linen Sys. for Hospitals, Inc.*, 671 S.W.2d 706, 709 (Tex. App.—Houston [1st Dist.] 1984, no writ). "Noncompetes

36

tailored to protectable business interests have their lawful place, but they should be used sparingly and drafted narrowly. And employers must demonstrate special facts that legitimize the noncompete agreement. Squelching competition for its own sake is an interest unworthy of protection. Competition by a former employee may well rile an employer, but companies do not have free rein to, by contract, indenture an employee or dampen everyday competition that benefits Texas and Texans." *Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 788 (Tex. 2011) (Willet, J., concurring).

The Business and Commerce Code provides that a covenant not to compete is enforceable only if:

> (1)  it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made and;
>
> (2)  it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee.

TEX. BUS. & COMM. CODE § 15.50(a). A restraint on trade is unnecessary if it is broader than necessary to protect the legitimate interests of the employer. *Gallahger Healthcare Ins. Servs. v. Vogelsang*, 312 S.W.3d 640, 654 (Tex. App.— Houston [1st Dist.] 2009, pet. denied). A restrictive covenant is "overbroad and unreasonable when it extends to clients with whom the employee had no dealings during his employment." *Id.*; *see also Peat Marwick Main & Co. v. Haass*, 818

S.W.2d 381, 386–88 (Tex. 1991). The Texas Supreme Court instructs that an agreement is overbroad and unreasonable if:

> (1) it inhibits a departing employee from servicing clients who were acquired after the employee left; or
>
> (2) it inhibits departing employees from servicing clients whom the employee had no contact while associated with his former employer.

*Id.* Moreover, this Court recognizes that an industry-wide exclusion is unreasonable. *Vogelsang*, 312 S.W.3d at 654; *see also John R. Ray & Sons, Inc. v. Stroman,* 923 S.W.2d 80, 85 (Tex. App.—Houston [14th Dist.] 1996, writ denied) (holding covenant not to compete prohibiting insurance agent from selling insurance policies within a county and all adjacent counties constitutes an unreasonable industry-wide restraint).

### *Standard of Review*

Whether a covenant not to compete is reasonable is a legal question for the court. *Haass*, 818 S.W.2d at 386. The burden of proving the necessity for and the reasonableness of the non-competition covenant falls upon the employer. *Martin*, 671 S.W.2d at 709. Moreover, a court of appeals cannot uphold a noncompete absent a record that demonstrates the limitations are reasonable and as nonburdensome as possible. *Marsh USA Inc.*, 354 S.W.3d at 785. As Justice Willet recognized, "Every company has customer relationships and attendant goodwill it wants to cultivate by incentivizing employees to stay, but merely

38

*asserting* goodwill is not enough . . . The evidentiary record must demonstrate special circumstances beyond the bruises of ordinary competition such that, absent the covenant, [the former employee] would possess a grossly unfair competitive advantage. And even then the restrictions imposed must be as light as possible and not restrict [the former employee's] mobility to an extent greater than [the employer's] legitimate need." *Id.* at 784-85 (emphasis in original).

> *The non-competition agreements, and the district court's temporary injunction, are unreasonable restraints that prohibit Parker and Myers from working in an entire industry*.

Texas courts have repeatedly recognized that a covenant not to compete is unreasonable if it seeks to prohibit a former employee from working in an entire industry. *Vogelsang*, 312 S.W.3d at 654; *Stroman*, 923 S.W.2d at 85; *Wright v. Sport Supply Group, Inc.*, 137 S.W.3d 289, 298 (Tex. App.—Beaumont 2004, no pet.). Schlumberger sought to enjoin Parker and Myers from working in the entire wireline, slick-line, and braided line industry (*see* 3 R.R. 19). The district court's order does so, providing:

> 6. Enjoined Parties shall not directly or indirectly work for, or assist (whether as an owner, employee, consultant, contractor or otherwise) any business or commercial operations of wireline, slick-line and braided line operations in the counties set forth in Plaintiff's Exhibit 74 which is attached.

C.R. 304.[3] The sole limitation to that order is a broad geographic one limiting the order to "the counties set forth in Plaintiff's Exhibit 74." *Id.* Plaintiff's Exhibit 74 is a list of 142 counties in Oklahoma, Arkansas, Texas, Louisiana, Pennsylvania, Ohio, West Virginia, and New York that purportedly constitutes the complete list of every county a work crew reporting to Myers ever worked during his three-year tenure with Schlumberger. *See* 4 R.R. 69-70.

Such a restriction, however, is not reasonable under the business and commerce code and constitutes an unreasonable industry-wide restraint under Texas law. *See Vogelsang*, 312 S.W.3d at 654; *Stroman*, 923 S.W.2d at 85; *Wright v. Sport Supply Group, Inc.*, 137 S.W.3d 289, 298 (Tex. App.—Beaumont 2004, no pet.). For example, in *Stroman*, the Fourteenth Court of Appeals held that a non-competition agreement that provided "[the employee] would not engage in or have an interest in any business that sold insurance policies or engaged in the insurance agency business within Harris County and all adjacent counties for a period of five years from the date of the Agreement" constituted an unreasonable industry-wide restraint on trade. *Stroman*, 923 S.W.2d at 83, 85. The court reasoned that the restraint could not be enforced because it completely prohibited

---

[3] Plaintiff's Exhibit 74 is not attached to the temporary injunction as the order states. *See* C.R. 299 - 306. However, there is a Plaintiff's Exhibit 74 in the record, which was admitted without objection and which identifies 142 counties in Oklahoma, Arkansas, Texas, Louisiana, Pennsylvania, Ohio, West Virginia, and New York in which Parker and Myers are prohibited from working. *See* 5 R.R. Pl.'s Ex. 74.

the employee's "ability to work in the insurance business in and around Harris County." *Id.* at 85. As in *Stroman*, the district court's injunction prohibits Parker and Myers from working in the entire wireline, slick-line, and braided line industry in the 142 counties in Oklahoma, Arkansas, Texas, Louisiana, Pennsylvania, Ohio, West Virginia, and New York listed in Plaintiff's Exhibit 74. *See* C.R. 304; 5 R.R. Pl.'s Ex. 74. Such restrictions constitute unreasonable industry-wide prohibitions, which are improper under Texas law. *See Stroman,* 923 S.W.2d at 83, 85; *see also Wright,* 137 S.W.3d at 298 (holding that agreement prohibiting employee "from, either directly or indirectly, conducting any sales related activities for a business related to the promotion, marketing, distribution, manufacturing, sourcing, importing and/or sale of sports related equipment and/or supplies to institutional customers in certain counties" constitutes an unreasonable restriction on trade).

In contrast, this Court has held that where an employer's non-competition agreement merely prohibits the employee from working in a specific industry for specific former clients of the employee, such a restriction does not constitute an industry-wide restraint because it "does not limit [the employee] from working in the insurance business, and she can practice her livelihood anywhere in the world . . . [h]owever, she cannot work with her [former] clients" for a limited period. *Vogelsang*, 312 S.W.3d at 655. This Court concluded that such a restraint was a reasonable because the restraint was narrowly tailored to individual clients

41

and did not prohibit the employee from working in the industry as a whole and earning a living. *Id.* Here, the district court's injunction prohibits Parker and Myers from earning a living in the wireline, slick-line, or braided line work in 142 counties in eight states. C.R. 304. Unlike the restriction in *Vogelsang*, the district court's injunction is not narrowly tailored merely to Parker and Myers' former clients with Schlumberger. *See id.* Accordingly, it is axiomatic that the industry-wide restriction covering 142 counties in eight states is not "as light [a restriction] as possible" as required to constitute a reasonable limitation on Parker and Myers' right to work. *Marsh USA Inc.*, 354 S.W.3d at 785. Instead, the injunction prohibits Parker and Myers from earning a living in the wireline industry, which is improper under Texas law. *See Stroman*, 923 S.W.2d at 85. The injunction should be reversed for this reason.

> ### *The non-competition agreements, and the district court's temporary injunction, are unreasonable in scope.*

Even setting aside the fact that the district court's injunction constitutes an improper industry-wide prohibition, the scope of the district court's injunction is overly broad and unreasonable. Where a covenant not to compete prohibits the employee from working "in any capacity" for a competitor of the former employer, the covenant is overbroad in scope as a matter of law. *McNeilus Companies, Inc. v. Sams*, 971 S.W.2d 507, 511 (Tex. App.—Dallas 1997, no writ).; *see also Recon Exploration, Inc. v. Hodges,* 798 S.W.2d 848, 853 (Tex. App.—Dallas 1990, no

42

writ) (non-competition covenant prohibiting employment in any business of type and character engaged in and competitive with former employer presented question of reasonableness).

While Schlumberger's employees repeatedly testified that it sought only to limit Parker and Myers in their ability to compete with Schlumberger in the wireline business (*see, e.g.,* 3 R.R. 19), the temporary injunction is not so limited. The injunction states:

> 6.     Enjoined Parties shall not directly or indirectly work for, or assist (whether as an owner, employee, consultant, contractor or otherwise) any business or commercial operation of wireline, slick line and braided line operations in the counties set forth in Plaintiff's Exhibit 74 which is attached.
>
> * * *
>
> 8.     Enjoined Parties shall not provide, or supervise, advise, manage or serve as a consultant for businesses who are performing wireline, slick line or braided line work for the Established Customers of Schlumberger in the states of Oklahoma, Texas, Arkansas, Kansas, Pennsylvania and Louisiana.

C.R. 304. Despite Schlumberger's stated intent, the injunction does not prohibit Parker and Myers merely from engaging in wireline, slick-line, and braided line work. The phrases "wireline, slick line and braided line operations" and "wireline, slick line or braided line work" identify the *type of business* that Parker and Myers cannot work for, but those phrases do not limit the *type of work* that Parker and Myers are prohibited from engaging in. *See* C.R. 304. Under the district court's injunction, Parker and Myers cannot do any kind of work for any business that

43

engages in wireline-type work, regardless if that business was ever a client of Schlumberger. C.R. 304. For example, the injunction would prevent Parker and Myers from working as custodians or caterers for a business that has never done business with Schlumberger that happens to perform wireline, slick-line, or braided line work in one of the 142 counties listed on Plaintiff's Exhibit 74. *See* C.R. 304. Likewise, Parker and Myers could not even perform custodial work for Schlumberger's "Established Customers." *See id.* As the injunction prohibits Parker and Myers from working *in any capacity* for *any* business that performs wireline-type work, the injunction is simply not narrowly tailored to protect Schlumberger's goodwill as required by the business and commerce code. *See* TEX. BUS. & COMM. CODE § 15.50. Accordingly, the district court's injunction should be reversed as it fails to comply with the statutory requirements imposed by the Texas Legislature. *See McNeilus Companies, Inc.*, 971 S.W.2d at 511.

> *The non-competition agreements, and the district court's temporary injunction, do not include reasonable restraints on the geographic area in which Parker and Myers are enjoined from working.*

Moreover, the evidence in the record demonstrates that the geographic area in which Parker and Myers have been enjoined from working is also unreasonable. The breadth of enforcement of territorial restraints in covenants not to compete depends upon the nature and extent of the employer's business and the degree of the employee's involvement. *Butler v. Arrow Mirror & Glass, Inc.*, 51 S.W.3d

44

787, 793 (Tex. App.—Houston [1st Dist.] 2001, no pet.); *Allan J. Richardson & Assocs., Inc. v. Andrews*, 718 S.W.2d 833, 835 (Tex. App.—Houston [14th Dist.] 1986, no writ). The covenant must bear some relationship to the activities of the employee. *Butler*, 51 S.W.3d at 793-94. Non-compete covenants with broad geographical scopes are unenforceable, particularly when no evidence establishes that the employee "*actually worked*" in all areas covered by the covenant. *Id.* (emphasis added). Courts have also concluded that limitations to clients the employee dealt with constitutes a reasonable alternative to a geographical limitation. *See Vogelsang*, 312 S.W.3d at 654 (citing *Stocks v. Banner Am. Corp.*, 599 S.W.2d 665, 666–68 (Tex. Civ. App.—Texarkana 1980, no writ); *Totino v. Alexander & Assocs.*, 1998 WL 552818, at *4 (Tex. App.—Houston [1st Dist.] Aug. 20, 1998, no pet.); *Investors Diversified Servs. v. McElroy*, 645 S.W.2d 338, 339 (Tex. App.—Corpus Christi 1982, no writ)).

Paragraph 6 of the district court's injunction attempts to set a geographic limitation by prohibiting Parker and Myers from performing "wireline, slick line and braided line operations in the counties set forth in Plaintiff's Exhibit 74 which is attached." C.R. 304 at ¶ 6. As noted above, Plaintiff's Exhibit 74 identifies 142 counties in Oklahoma, Arkansas, Texas, Louisiana, Pennsylvania, Ohio, West Virginia, and New York. 5 R.R. Pl.'s Ex. 74. This does not, however, constitute a reasonable geographic limitation under Texas law, which requires that such an

45

order be limited to locations in which the enjoined party "actually worked." *See Butler*, 51 S.W.3d at 793. It is Schlumberger's burden to produce evidence in the temporary injunction hearing that Parker and Myers actually worked in the areas it seeks to enjoin them from working. *Marsh USA Inc.*, 354 S.W.3d at 785.

At the temporary injunction hearing, Schlumberger's Production Manager for North America, who managed Schlumberger's entire wireline and slick-line operations in North America, admitted that Parker and Myers worked from Schlumberger's Pocola, Oklahoma office. *See* 3 R.R. 24-25. The Schlumberger Production Manager also admitted that Parker and Myers' work was focused primarily within the state of Oklahoma. 3 R.R. 25. Indeed, relative to the list of 142 counties in eight states in which Parker and Myers are now prohibited from working, Schlumberger's evidence is simply that a work crew under Myers worked in each of those counties at one time or another. *See* 4 R.R. 69-70.

There is no evidence that Parker or Myers traveled to any of these counties, actually supervised the work, had any contact with the clients Schlumberger was servicing in the counties, or otherwise were connected with the listed counties outside Oklahoma in any way, with the sole exception that, Schlumberger says, Myers was responsible for "making sure that the charges were right on the ticket." 4 R.R. 69-70. Evidence that Myers ensured that charges were correct, however, in no way satisfies Schlumberger's burden to prove that Myers and Parker "actually

46

worked" in the 142 counties listed in Plaintiff's Exhibit 74. *See, e.g., Butler*, 51 S.W.3d at 793 (requiring evidence that employee "actually worked" in location to prohibit him from subsequently working there based upon a covenant not to compete). Indeed, there can be no reasoned basis for enjoining Parker and Myers from working in the 142 counties in eight states listed in Plaintiff's Exhibit 74 as the purpose of such injunctions is to prohibit former employees from possessing a "grossly unfair competitive advantage" over their former employer, and one can gain no such advantage by merely approving bills to be sent to the employer's customers. *See Marsh USA Inc.*, 354 S.W.3d at 785. As the record provides no evidence establishing that Parker and Myers actually worked in the 142 counties in eight states listed in Plaintiff's Exhibit 74, the district court's order granting temporary injunction does not include a reasonable geographic restriction and should be reversed. *Id.*

Moreover, the order does not meet the alternative requirement of substituting geographic restrictions for a limitation to clients Parker and Myers dealt with. *See Vogelsang*, 312 S.W.3d at 654. Paragraphs 7 and 8 of the injunction prohibit Parker and Myers from soliciting "wireline, slick line or braided line work and/or service, from the Established Customers of Schlumberger in the states of Oklahoma, Texas, Arkansas, Kansas, Pennsylvania, and Louisiana," and from performing "wireline, slick line or braided line work for the Established Customers

47

of Schlumberger in the states of Oklahoma, Texas, Arkansas, Kansas, Pennsylvania and Louisiana." C.R. 304. The "Established Customers" of Schlumberger are set forth in Plaintiff's Exhibit 13, which is a list of 62 various business entities. C.R. 293-94.

However, it is, again, Schlumberger's burden, as an employer seeking to enjoin Parker and Myers, to produce competent evidence that Parker and Myers dealt with each of those customers while working for Schlumberger. *See Marsh USA Inc.*, 354 S.W.3d at 785. It attempted to do so by offering Plaintiff's Exhibit 13, which purports to be a list of "Parker Energy Services" customer base, into evidence. *See* 4 R.R. 114. That list, however, is a hearsay statement the district court improperly admitted into evidence over Parker and Myers' objection, and is not competent evidence of the customers Parker and Myers dealt with while employed by Schlumberger. *See* TEX. R. EVID. 801-03.

"Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. TEX. R. EVID. 801. The list of customers set forth in Plaintiff's Exhibit 13 is an out-of-court statement offered for the truth of the matter asserted. *See* 4 R.R. 114; 5 R.R. Pl.'s Ex. 13. Despite Parker and Myers objection to the exhibit, Schlumberger offered no evidence that Plaintiff's Exhibit 13 meets any exception to the hearsay rule or otherwise does not qualify as hearsay. *Compare* 3 R.R. 114

48

*with* TEX. R. EVID. 801-03. Moreover, other than the document itself, which is not competent evidence, Schlumberger offered no evidence demonstrating that each of the entities listed on the exhibit were customers of Parker or Myers during their respective tenures with Schlumberger or that Parker and Myers otherwise had any dealings with those customers while employed by Schlumberger. Accordingly, as the document is hearsay that the district court should have been excluded from evidence, there is simply no competent evidence demonstrating that Parker and Myers dealt with each of the 62 entities listed on Plaintiffs' Exhibit 13 as required to support the trial court's restriction of Parker and Myers' right to perform wireline, slick-line, or braided line work for those entities. *See* TEX. R. EVID. 801-03; *Marsh USA Inc*., 354 S.W.3d at 785.[4]

Moreover, even if Plaintiff's Exhibit 13 constituted competent evidence, which it does not, it is not evidence that Parker or Myers, in their individual capacities, had a relationship with any of the listed entities. *See* 3 R.R. 114. It is simply a list of entities "Parker Energy Services" worked for at some point in time. *Id.* While Parker and Myers were managers of Parker Energy, there is no evidence Parker or Myers had a personal relationship with, or otherwise dealt with, each of

---

[4] Out of the 62 entities listed in Plaintiff's Exhibit 13, there is evidence in the record that Parker or Myers dealt with only five during their tenure with Schlumberger: B.P., Chevron, Unit Petroleum, X.T.O.Energy, and Jones Energy. *See* 3 R.R. 33-34, 69, 87.

the listed entities. *See Vogelsang,* 312 S.W.3d at 654; *Investors Diversified Servs.*, 645 S.W.2d at 339 (concluding that noncompetition covenant restricted "to 150 current customers of the [employer], with whom the [employee] had contacted or dealt with" was reasonable).

It is "well-settled that corporations can act only through its agents and employees." *In re Credit Suisse First Boston Mortg. Capital, L.L.C.*, 273 S.W.3d 843, 849 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (citing *GTE Sw., Inc. v. Bruce*, 998 S.W.2d 605, 618 (Tex. 1999); *Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 391 (Tex. 1997)). When a party sues a person in their individual capacity, as Schlumberger sued Parker and Myers, it must prove that the individual performed the act complained of. *See, e.g., Revere Oil Co. v. Bank of Chillicothe,* 255 S.W. 219, 220 (Tex. Civ. App.—Amarillo 1923, no writ). "'Individually' means separately and personally, as distinguished from jointly or officially, and as opposed to collective or associate action or common interests." *S. Distrib. Co. v. Carraway*, 127 S.E. 427, 428 (N.C. 1925) (*citing Revere Oil*, 255 S.W. at 220). Accordingly, a document showing that "Parker Energy Services" had a relationship with another business entity is no evidence that Parker or Myers, in their individual capacities, dealt with those other entities. *See id.* As Texas public policy prohibits injunctions simply to stifle competition, without evidence that Parker or Myers specifically dealt with the 62 entities listed on Plaintiff's Exhibit 13, the district

50

court's injunction is unreasonable. *See Vogelsang,* 312 S.W.3d at 654; *Investors Diversified Servs.,* 645 S.W.2d at 339.

> ### *The non-competition agreements and the district court's temporary injunction are not reasonably limited in time.*

In addition to being reasonably limited in scope and geography, the Business and Commerce Code requires that covenants not to compete be reasonably limited in time. *See* TEX. BUS. & COMM. CODE § 15.50(a). Although the district court recognized that the ICN Agreements and the Bonus Retention Contract each provided Schlumberger with only a one year period during which the non-compete provisions would apply,[5] the district court indefinitely enjoined Parker and Myers from performing wireline work. *See* C.R. 296-305. Such an open-ended injunction is not reasonable and does not comply with the requirements of the Business and Commerce Code. *See* TEX. BUS. & COMM. CODE § 15.50(a).

Moreover, as to Parker, the district court's injunction is not reasonably restricted in time as he resigned his position with Schlumberger on October 2, 2013 (2 R.R. 15-16), and there is no proper basis to continue to enjoin him from working in the wireline industry months after his covenant not to compete expired by its own terms. 5 R.R. Pl.'s Ex. 1 at ¶¶ 5, 7.

---

[5] *See* C.R. 298 ("The ICN Agreements also contained one year restrictions on certain competitive activities after their employment ended."); *Id.* ("Paragraph 5 of the Retention Bonus Contract provides that during his employment with the Company and for a period of one year following the end of his employment, he would not [compete with Schlumberger]").

By its own terms, Parker's non-competition covenant expired on October 2, 2014, one year after he resigned his position with Schlumberger. *See* 3 R.R. 31; 5 R.R. Pl.'s Ex. 1 at ¶ 5 ("Employee agrees that for a period of one (1) year following the date of termination of his/her employment with Company, Employee will not directly or indirectly work for or assist . . . [any competing business]"). Parker, however, has been restrained and enjoined from performing wireline work since October 9, 2014, when the district court signed a temporary restraining order prohibiting him from working. C.R. 304. Accordingly, Parker has been prohibited from working for months after his covenant not to compete expired by its own terms.

The district court, however, ruled that the evidence showed that the non-compete agreement should be tolled and extended, specifically referencing Parker's purchase of equipment in preparation to compete with Schlumberger in early 2014. *See* C.R. 300, 4 R.R. 124.[6] However, as this Court recognizes: "[T]o resign from one's employment and go into business in competition with one's

---

[6] A tolling provision in the ICN Agreement provides: "If Employee is found to have breached any promise made in Paragraph 5 of this Agreement, the one-year period specified in Paragraph 5 shall be extended by the period of time for which Employee was in breach." 5 R.R. Pl.'s Ex. 1 at ¶ 7. Relative to the tolling provision, the evidence in the record shows that Parker (1) purchased wireline trucks in January 2014 (3 R.R. 46); (2) purchased additional tools in April 2014 (3 R.R. 46); (3) purchased miscellaneous pick-up trucks for P.W.L. in August or September 2014 (3 R.R. 48); (4) hired Myers to work for P.W.L. on September 17, 2014 (*see* 3 R.R. 58); and (5) performed the first job for P.W.L. on September 29, 2014 (3 R.R. 68).

former employer is, under ordinary circumstances, a constitutional right. There is nothing legally wrong in engaging in such competition *or in preparing to compete before the employment terminates.*" *See Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 510 (Tex. App.—Houston [1st Dist.] 2003, no pet.) (emphasis added) (citations omitted). It is only where a covenant not to compete specifically prohibits preparing to compete that one may be prohibited from engaging in such preparations. *See id*.

The I.C.N. Agreement does not preclude Parker from "preparing" to compete, it provides that, for a period of one year, he may not "*work for or assist* . . . any business . . . whose business *is* . . . in direct or indirect competition with [Schlumberger]." 5 R.R. Pl. Ex. 1 at ¶ 5 (emphasis added). Such language is written in the present tense, and, therefore, precludes Parker from working for businesses in *present* competition with Schlumberger. *See id*. To conclude, as the district court did, that the non-compete provision precludes preparing to compete in the future, improperly adds restrictions to the agreement. *Borders v. KRLB, Inc*., 727 S.W.2d 357, 359 (Tex. App.—Amarillo 1987, writ ref'd n.r.e.) ("The ultimate restraint is that a court cannot, through the construction process, make a new contract for the parties, one they did not make."). Indeed, the district court's injunction, which penalizes Parker for preparing to compete, violates the public policy of the state set forth by this Court that persons may properly "prepare[] to

53

compete" with their former employers absent an express agreement to the contrary. *Abetter Trucking Co.*, 113 S.W.3d at 510.

At the earliest, Parker's non-compete agreement was tolled on September 17, 2014, when he hired Myers to work for P.W.L. *See* 3 R.R. 58. Even tolling the non-compete agreement for that 15 day period (the time period between September 17, 2014 and October 2, 2014), that the injunction against Parker should have expired on October 24, 2014 (15 days after the district court's initial entry of a temporary restraining order prohibiting Parker from working). The district court's continued indefinite injunction prohibiting Parker from working is unreasonable as he has now been restrained and enjoined from working for months after his non-compete agreement should have expired. The district court's injunction should be reversed for this additional reason as it is not reasonably limited in time as required by the Business and Commerce Code. TEX. BUS. & COMM. CODE § 15.50.

### E. There Is No Evidence Of Irreparable Harm As Required To Support Injunctive Relief.

To be entitled to a temporary injunction, a party must establish that it has an inadequate remedy at law. *Butnaru v. Ford Motor Co*., 84 S.W.3d 198, 210 (Tex. 2002). In other words, the party must establish that it will suffer irreparable harm if the injunction is not granted. *See id*; *see also Cardinal Health Staffing Network, Inc. v. Bowen,* 106 S.W.3d 230, 240 (Tex. App.—Houston [1st Dist.] 2003, no

54

pet.) (holding that party must prove irreparable injury to be entitled to injunctive relief stemming from breach of non-competition agreement). On appeal, the standard of review for determining whether the record demonstrates an irreparable harm is abuse of discretion. *Cardinal Health Staffing Network*, 106 S.W.3d at 234.

Review of the record demonstrates that there is no evidence that Schlumberger will suffer irreparable harm in the absence of an injunction. Schlumberger's corporate representative repeatedly admitted that Schlumberger had an adequate legal remedy for each of its claims against Parker and Myers - damages. *See* 4 R.R. 93 ("Q: The loss of tools a harm Schlumberger can't fix? Or can Schlumberger buy more tools? A: We can buy more tools.); 4 R.R. 93 (Q: The loss of employees is not a harm that Schlumberger can't fix; you can hire and train more people, correct? A: We can hire and train more people over a period of time"); 4 R.R. 98-99 (Q: So you can calculate monetary damages for lost business, can't you? A: We can calculate? Q: Monetary damages for lost business. A: An estimated amount. Q Okay. And then you can be paid for the lost business caused by any wrongdoing of Mr. Parker and Mr. Myers, correct? A: We can be paid for damages.").

Such admissions show that Schlumberger has an adequate remedy at law - damages for lost business. Indeed, Schlumberger is seeking to recover such damages in the underlying lawsuit. *See* C.R. 14-16. As Schlumberger admits it

55

has an adequate remedy at law, the district court abused its discretion in signing a temporary injunction prohibiting Parker and Myers from working, and the temporary injunction should be reversed for this independent reason. *Cardinal Health Staffing Network, Inc.*, 106 S.W.3d at 243 (affirming trial court's order denying the temporary injunction where record showed applicant had an adequate legal remedy to enforce non-competition agreement).

## CONCLUSION AND PRAYER

For the reasons noted above, Appellants Ricky Parker and James Myers respectfully request that the Court reverse the district court's interlocutory orders denying their motion to compel arbitration and denying the motion for reconsideration of their motion to compel arbitration. Parker and Myers further request that the Court reverse the district court's order granting Schlumberger's application for temporary injunction and permit Parker and Myers to resume work for their Oklahoma employer Professional Wireline LLC.

56

Respectfully submitted,

MARTIN, DISIERE, JEFFERSON & WISDOM, L.L.P.


By: */s/ Robert T. Owen*

    Levon G. Hovnatanian
    State Bar No. 10059825
    *hovnatanian@mdjwlaw.com*
    Kevin G. Cain
    State Bar No. 24012371
    *cain@mdjwlaw.com*
    Robert T. Owen
    *owen@mdjwlaw.com*
    State Bar No. 24060370
808 Travis, Suite 20th Floor
Houston, Texas 77002
(713) 632-1700 – Telephone
(713) 222-0101 – Facsimile

**ATTORNEYS FOR APPELLANTS**
**RICKY D. PARKER AND JAMES MYERS**

Of Counsel:

W. Jackson Wisdom
State Bar No. 21804025
*wisdom@mdjwlaw.com*
James M. Cleary
State Bar No. 00783838
*cleary@mdjwlaw.com*
808 Travis, Suite 20th Floor
Houston, Texas 77002
(713) 632-1700 – Telephone
(713) 222-0101 – Facsimile

## CERTIFICATE OF COMPLIANCE

This is to certify that this computer-generated Appellant's Brief contains 13,516 words.

/s/ Robert T. Owen
Robert T. Owen
Dated: January 28, 2015

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of January, 2015, a true and correct copy of the foregoing appellants' brief on the merits was sent by the method(s) indicated to the following individuals:

Mr. Jeff Barnes           *via e-file and e-mail: barnesj@jacksonlewis.com*
JACKSON LEWIS, P.C.
1415 Louisiana, Suite 3325
Houston, Texas 77002

Mr. William L. Davis       *via e-file and e-mail: davisw@jacksonlewis.com*
JACKSON LEWIS, P.C.
500 N. Akard, Suite 2500
Dallas, Texas 75201

/s/ Robert T. Owen
Robert T. Owen

# APPENDICES

## INDEX

Order Denying Defendants' Motion to Compel Arbitration ........................... 1

Order Denying Defendants' Motion for Reconsideration of
Its Motion to Compel Arbitration .................................................................. 2

Temporary Injunction .................................................................................... 3

Asset Purchase Agreement dated September 9, 2011 ...................................... 4

Intellectual Property, Confidential Information and
Non Compete Agreement (Ricky Parker) ......................................................... 5

Intellectual Property, Confidential Information and
Non Compete Agreement (James Myers) .......................................................... 6

Retention Bonus Contract ............................................................................... 7

Oklahoma Statute tit. 15 § 217 ....................................................................... 8

Oklahoma Statute tit. 15 § 219A ..................................................................... 9

Texas Business & Commerce Code § 15.50 ..................................................... 10

Texas Business & Commerce Code § 15.51 ..................................................... 11

1



Filed
12/10/2014 2:35:48 PM
Annie Rebecca Elliott
District Clerk
Fort Bend County, Texas
Danney Mascorro

## CAUSE NO. 14-DCV-218252

| | | |
|---|---|---|
| SCHLUMBERGER TECHNOLOGY CORPORATION, *Plaintiff,* | § § § § | IN THE DISTRICT COURT OF |
| v. | § § § | FORT BEND COUNTY, TEXAS |
| RICKY D. PARKER and JAMES MYERS, *Defendants.* | § § | 268TH JUDICIAL DISTRICT |

## ORDER DENYING DEFENDANTS' MOTION TO COMPEL ARBITRATION

On December 5, 2014, came on before the Court Defendants' Motion to Compel Arbitration. The Court, having considered the motion, Plaintiff's response, the argument of counsel, and all other pleadings and evidence before it, finds that any claims arising under the Asset Purchase Agreement among Production Wireline and Cased Hole Services Group, LLC ("PWCHSG"), Parker Energy Services Company and Ricky D. Parker ("Parker") dated as of September 9, 2011 ("APA") must be arbitrated. The Court finds, however, that Plaintiff in this action is not bringing any claims against the Defendants under the APA. The Court also finds that any claims brought under the following agreements are not arbitrable: (a) the Intellectual Property, Confidential Information and Non-Compete Agreement between Plaintiff and Parker dated September 10, 2011, (b) the Intellectual Property, Confidential Information and Non-Compete Agreement between Plaintiff and James Myers ("Myers") dated September 10, 2011, and (c) the Retention Bonus Contract between PWCHSG and Myers dated September 15, 2011.

In sum, the Court finds that Defendants' Motion to Compel Arbitration should be DENIED.

SIGNED THIS ___18___ day of ___December___ 2014.

_____
PRESIDING JUDGE

ROUTED TO COURT
RT'D TO D. CLERK   12 11 14 AW

284

2



Filed
12/10/2014 2:35:48 PM
Annie Rebecca Elliott
District Clerk
Fort Bend County, Texas
Dannay Mascorro

## CAUSE NO. 14-DCV-218252

| | | |
|---|---|---|
| SCHLUMBERGER TECHNOLOGY CORPORATION, *Plaintiff,* | § § § § | IN THE DISTRICT COURT OF |
| v. | § § § | FORT BEND COUNTY, TEXAS |
| RICKY D. PARKER and JAMES MYERS, *Defendants.* | § § | 268TH JUDICIAL DISTRICT |

### ORDER DENYING DEFENDANTS' MOTION FOR RECONSIDERATION OF ITS MOTION TO COMPEL ARBITRATION

On December 8, 2014, upon the conclusion of the hearing of Plaintiff's Application for a Temporary Injunction, came on before the Court Defendants' Motion for Reconsideration of the Court's Denial of their Motion to Compel Arbitration. The Court, having considered the motion, Plaintiff's response, the argument of counsel, and all other pleadings and evidence before it, finds that the motion should be DENIED for the reasons stated in its Order Denying Defendants' Motion to Compel Arbitration.

SIGNED THIS _____ day of _____ 2014.

_____
PRESIDING JUDGE

ROUTED TO COURT
RT'D TO D. CLERK 12-11-14 AW

285

**3**

Filed
12/12/2014 12:07:44 PM
Annie Rebecca Elliott
District Clerk
Fort Bend County, Texas
Ariana Salazar

CAUSE NO. 14-DCV-218252

| | | |
|---|---|---|
| SCHLUMBERGER TECHNOLOGY CORPORATION, | § § § | IN THE DISTRICT COURT OF |
| Plaintiff, | § § § | |
| v. | § § | FORT BEND COUNTY, TEXAS |
| RICKY D. PARKER and JAMES MYERS, | § § § | |
| Defendants. | § | 268TH JUDICIAL DISTRICT |

## TEMPORARY INJUNCTION

On December 5 and 8, 2014, the Court held a hearing on Plaintiff Schlumberger Technology Corporation's request for a temporary injunction. Plaintiff appeared at the hearing and offered evidence in support of the request for a temporary injunction. Defendants did not appear, but were represented by counsel at the hearing. The Court heard testimony and considered the evidence and arguments of the parties and finds as follows.

The Court finds that the evidence establishes the elements necessary for the issuance of a temporary injunction. Schlumberger has established a probable right to relief necessary to obtain a temporary injunction with respect to its claims for breach of contract and tortious interference with contract, tortious interference with prospective business relationships, breach of contract, breach of fiduciary duty and duty of loyalty, and aiding and abetting breach of fiduciary duty and duty of loyalty. Ricky Parker sold the assets of his business (Parker Energy Services) to Schlumberger. He signed the agreement in Houston, Texas. In connection with the sale, he and James Myers entered into Intellectual Property, Confidential Information, and Non-Compete Agreements with Schlumberger (the "ICN Agreements") – Plaintiff's Exhibits 1 and 2. The ICN Agreements contain detailed and specific definitions of Confidential Information,

ROUTED TO COURT 12·10·14 ACS
RT'D TO D. CLERK 12/18/14 VV

296

Intellectual Property, and Company Intellectual Property and the restrictions relating to the use

and disclosure of Confidential Information:

"Company Confidential Information" is defined as: technical information, software, databases, methods, know-how, formulae, compositions, drawings, designs, data, prototypes, processes, discoveries, machines, inventions, well logs or other data, equipment, drawings, notes reports, manuals, business information, compensation data, clients lists, client preferences, client needs, client designs, financial information, credit information, pricing information, information relating to future plans, marketing strategies, new product research, pending projects and proposals, proprietary design processes, research and development strategies, information relating to employees, consultants and independent contractors including information relating to salaries, compensation, contracts, benefits, inceptive plans, positions, duties, qualifications, project knowledge, other valuable confidential information, trade secrets, patent applications, and related filings regardless of whether or not identified as confidential or proprietary, and similar items.

"Intellectual Property" is defined as: all patents, trademarks, copyrights, trade secrets, Company Confidential Information, new or useful arts, ideas, discoveries, inventions, improvements, software, business information, lists, information considered by Company to be confidential, designs, drawings, writings, contributions, works of authorship, findings or improvements, formulae, processes, product development, manufacturing techniques, business methods, tools, routines and methodology, documentation, systems, enhancements or modifications thereto, know-how, and developments, any derivative works and ideas whether or not patentable, and any other form of intellectual property.

"Company Intellectual Property" is defined as: all Intellectual Property, that was authored, conceived, developed, or reduced to practice by Employee (either solely or jointly with others) during the term of his/her employment. Company Intellectual Property may be originated or conceived during the term of Employee's employment but completed or reduced to practice thereafter. Company Intellectual Property shall be deemed a "work made for hire" as that term is defined by the copyright laws of the United States. Company Intellectual Property also includes any "Pre-existing Intellectual Property" assigned, licensed, or transferred to

2

297

Company, and any "Preexisting Intellectual Property" in which Company has a vested or executory interest.

The ICN Agreements also contained one year restrictions on certain competitive activities after their employment ended. Paragraph 5 of the ICN Agreements provides that while employed by Schlumberger, and for a period of one year after their employment with Schlumberger ended, they would not directly or indirectly work for or assist, (whether as an owner, employee, consultant, contractor or otherwise) any business or commercial operation whose business is in direct or indirect competition with the area of Schlumberger's business in which they were employed. The area of business where James Myers and Ricky Parker were employed was the wireline, slick line and braided line services for oil and gas wells. The one-year restriction provides for an extension of time while they were breaching the restrictions. Both Parker and Myers breached paragraph 5 of their ICN Agreements.

Paragraph 13 of the ICN Agreements contains a restriction on soliciting Schlumberger employees. Both Parker and Myers breached paragraph 13 of their ICN Agreements.

James Myers signed a Retention Bonus Contract in connection with the sale of the business – Plaintiff's Exhibit 3. Pursuant to the terms of the Retention Bonus Contract, Myers was paid money in connection with the sale of the business and in exchange for his agreement to remain employed for a period of two years after he signed the agreement. He also agreed not to use or disclose Confidential Information, and agreed to return all documents, email communications, computer data and other Company materials, whether or not they contain Confidential Information, upon the separation from employment with the Company or upon request. Paragraph 5 of the Retention Bonus Contract provides that during his employment with the Company and for a period of one year following the end of his employment, he would not:

3

298

(a)     Solicit, contact, or accept work, which was the same or substantially similar to the work and/or services performed by him for the Company, from clients of the Company with whom he had business dealings during his employment with the Company.

(b)     Provide services (including consulting services) which are the same or substantially similar to services and/or work performed by him for the Company, for clients of the Company with whom he had business dealings during his employment with the Company.

(c)     Solicit, recruit, encourage, hire or assist any other person or entity to solicit, recruit, encourage or hire for employment any employee or independent contractor of the Company to work for a competitor.

(d)     Directly or indirectly own, manage, operate, control, be employed by, be a consultant for, or perform any job functions for, any business that is in competition with the Company.

The testimony established that the Company for purposes of the Retention Bonus Contract was the Parker Energy Services business acquired by Schlumberger which provided wireline, slick line and braided line services to oil and gas wells. The geographic territory specified in the Retention Bonus Contract is the territory serviced by the offices where Myers worked. Myers had management responsibilities over offices in Oklahoma, Pennsylvania, and Arkansas. The counties served by these offices are identified in Plaintiff's Exhibit 74, which is attached to this ORDER and incorporated herein.

Myers has breached paragraph 5 of the Retention Bonus Contract. The Retention Bonus Contract provides that Myers entitlement to the $100,000.00 Bonus Award is contingent upon his complying with paragraph 5 as written. Schlumberger paid the Bonus Award to Myers

4

and he has not returned the money.

Both Ricky Parker and James Myers were in management roles at Schlumberger and also had extensive contact with Schlumberger customers. They had access to, and used, Confidential Information as defined in the agreements at issue. Access and use was necessary for them to secure business for Schlumberger, staff the jobs, and service the customers. They also visited customers, learned their business needs and preferences, and communicated with other Schlumberger managers and sales representative regarding strategies for developing business. They were both the beneficiaries of the goodwill Schlumberger developed with existing customers.

Ricky Parker resigned from Schlumberger on October 2, 2013. He continued to come to the Schlumberger offices and continued to have access to information regarding Schlumberger's business after his employment ended. Without informing Schlumberger, he ordered six trucks costing approximately $360,000.00 each in January of 2014. The trucks were for use in the business he was forming, PWL-LLC, which would do business under the name Professional Wireline. The trucks were designed for performing wireline, slick line and braided line services for oil and gas wells. PWL is the same abbreviation used by Schlumberger in describing its "Production Wireline" business. Parker also purchased tools, supplies, equipment, and had Myers assist him while still employed by Schlumberger. He also registered the PWL-LLC business with the Texas Secretary of State indicating that it would do business in Texas and purchased insurance from a Texas-based insurance broker. He also completed a Vendor Profile seeking to do business with one of Schlumberger's clients stating that services would be performed by the competing business in Texas, Oklahoma, and Arkansas.

Schlumberger confronted James Myers regarding what he knew about the competing

5

300

business and he claimed to have no knowledge, and also confirmed that he would not go to work for the competing business. Contrary to his representations, James Myers planned to go to work for the competing business. Ricky Parker took delivery of the trucks and then Schlumberger employees, while still employed by Schlumberger and during working hours, visited the new business location where the trucks were delivered.

James Myers also began going to the new business location, while still employed by Schlumberger, during business hours. He was also using a Schlumberger vehicle. He also worked with Parker to obtain offers of employment for Schlumberger employees and set up a meeting with Schlumberger employees to present the offers. On September 16, 2014, Myers left his Schlumberger truck at the Schlumberger offices, but the tool boxes and tools normally in the truck were missing. While misrepresenting to Schlumberger that he was not resigning, and while still employed by Schlumberger, James Myers set up a meeting with several Schlumberger employees and they met with him on the evening of September 16. On September 17, 2014, eleven Schlumberger employees tendered their resignations with no advance notice to go to work for Parker and Myers in the competing business. The sudden departure of these employees and missing equipment caused Schlumberger to be unable to service customers. At the same time, Myers began meeting with Schlumberger's customers on September 17, 2014, to solicit business from the customers. To facilitate solicitation of the customers and convince them to transfer business to the PWL, Myers took several former Schlumberger employees with him to show the customers that PWL could offer the services of the same employees who had been performing work for them at Schlumberger. Professional Wireline began performing work for these customers shortly after these meetings after obtaining Master Service Agreements "MSA's" with the customers. Three such MSA's with customers (BP, XTO and Linn Energy) contain Texas

6

choice of law and choice of venue provisions. Professional Wireline has performed work in Texas and several of the customers at issue are based in Texas.

Professional Wireline has also copied its HSE materials from Schlumberger HSE materials acquired in the purchase of the Parker Energy Services business. One of the employees who left Schlumberger to work for Professional Wireline, Daniel Harrison, also accessed the Parker Energy Services email account after his employment ended and forwarded client information such as work orders containing pricing and job safety analysis reports to his PWL-LLC email account. Defendants also admit taking a Parker Energy Services price list which the testimony from Plaintiff established was confidential. James Myers also retained his cell phone he used at Schlumberger for communicating with customers, and that phone has now been given to one of the former employees who left Schlumberger to go to work for Professional Wireline so he could use it while the temporary restraining order was in place.

The breaches, both during Myers' employment and during the one-year non-compete period of Myers' and Parker's ICN Agreements, were intended to divert the business to the new business operated by Myers and Parker. Further, the business names used by them, "PWL" and "Professional Wireline" is similar to the name used by Schlumberger – Production Wireline or "PW."

Defendants did not appear at the original hearing set for October 24, 2014, nor did they appear at the injunction hearing on December 5 or 8, 2014. Defendants did not comply with the original Temporary Restraining Order entered on October 9, 2014. In the deposition testimony of Defendants admitted into evidence at the injunction hearing, Defendants offered as an excuse for their breaches that they never read the agreements. The Court concludes that Defendants will continue to breach their agreements unless enjoined.

7

302

The Established Customers of the Schlumberger business at issue are reflected in Plaintiff's exhibit 13. The counties where Schlumberger offices managed by Defendants performed work are reflected in Plaintiff's Exhibit 74.

The Court further finds that immediate and irreparable injury, loss, or damage will result to Plaintiff unless this temporary injunction is entered. Unless immediately restrained, the Defendants' breach of the agreements will cause irreparable harm to Schlumberger for which there is no adequate remedy at law, including loss of existing customers and employees, loss of business opportunities, loss of goodwill and business reputation, and loss of confidential information. Money damages cannot adequately compensate Schlumberger. A temporary injunction is necessary to preserve Schlumberger's rights pending a trial on the merits and warranted by the plain language and requirements of the agreements.

It is, therefore ORDERED, that James Myers and Ricky Parker, their agents, servants, employees, and anyone in active concert or participation with them who receive actual notice of this Order ("Enjoined Parties") is/are hereby enjoined as follows:

1.  Enjoined Parties shall not retain, conceal, move, or share with others any of Schlumberger's equipment, property, documents, reports, files, books, records, or Confidential Information or Company Intellectual Property.

2.  Enjoined Parties shall immediately provide to Schlumberger any and all external storage devices that James Myers or Ricky Parker ever put Schlumberger Company Confidential Information or Company Intellectual Property on that is in the Enjoined Parties' possession.

3.  Enjoined Parties shall not delete or destroy any Schlumberger property,

8

303

Company Confidential Information or Company Intellectual Property contained on any computer, phone, disc, data storage device, email account, or cloud storage.

4. Enjoined Parties shall not disclose Schlumberger's Company Confidential Information or Company Intellectual Property for any reason.

5. Enjoined Parties shall not directly or indirectly recruit, hire, solicit, or assist others in recruiting, hiring, or soliciting employees of Schlumberger.

6. Enjoined Parties shall not directly or indirectly work for, or assist (whether as an owner, employee, consultant, contractor or otherwise) any business or commercial operations of wireline, slick line and braided line operations in the counties set forth in Plaintiff's Exhibit 74 which is attached.

7. Enjoined Parties shall not solicit, contact, or accept wireline, slick line or braided line work and/or services, from the Established Customers of Schlumberger in the states of Oklahoma, Texas, Arkansas, Kansas, Pennsylvania, and Louisiana.

8. Enjoined Parties shall not provide, or supervise, advise, manage, or serve as a consultant for businesses who are performing, wireline, slick line or braided line work for the Established Customers of Schlumberger in the states of Oklahoma, Texas, Arkansas, Kansas, Pennsylvania and Louisiana.

Plaintiff previously posted a $5,000.00 bond. The bond is increased to $50,000.00. Upon posting the additional $45,000.00 bond, the clerk of this court shall issue a temporary injunction in conformity with the law and the terms of this Order. Until that time, the

9

304

Temporary Restraining Order as extended in the Second Agreed Order Extending Temporary

Restraining Order entered on November 13, 2014, shall be extended and remains in effect.

It is further ORDERED that the trial of this cause shall commence on the _17_ day

of _March 2015_ at _9:00_ .

SIGNED on this _18_ day of December _____, 2014, at _3:05_ o'clock _p_.m.

_____
JUDGE PRESIDING

10

305

4

ASSET PURCHASE AGREEMENT

AMONG

PRODUCTION WIRELINE AND CASED HOLE SERVICES GROUP, L.L.C.,

PARKER ENERGY SERVICES COMPANY

AND

RICKY D. PARKER

Dated as of September 9, 2011



**EXHIBIT**

**A**

217

Closing Date with respect to such Taxes and Purchaser shall prepare and timely file all Tax Returns due after the Closing Date with respect to such Taxes. If one party remits to the appropriate Taxing Authority payment for Taxes, which are subject to proration under this Section 11.2 and such payment includes the other party's share of such Taxes, such other party shall promptly reimburse the remitting party for its share of such Taxes.

11.3 Cooperation on Tax Matters.

(a) Purchaser and Seller shall furnish or cause to be furnished to each other, as promptly as practicable, such information and assistance relating to the Purchased Assets and the Assumed Liabilities as is reasonably necessary for the preparation and filing of any Tax Return, claim for refund or other required or optional filings relating to Tax matters, for the preparation for any Tax audit, for the preparation for any Tax protest, for the prosecution or defense of any suit or other proceeding relating to Tax matters.

(b) Purchaser shall retain possession of all accounting, business, financial and Tax records and information relating to the Purchased Assets or the Assumed Liabilities that are in existence on the Closing Date and transferred to Purchaser hereunder for a period of at least three (3) years from the Closing Date. Purchaser shall give Seller notice and an opportunity to retain any such records in the event that Purchaser determines to destroy or dispose of them after such period. In addition, from and after the Closing Date, Purchaser shall provide access to Seller (after reasonably detailed prior notice and during normal business hours), to the books, records, documents and other information relating to the Purchased Assets or the Assumed Liabilities as is reasonably necessary for Seller to properly prepare for, file, prove, answer, prosecute and/or defend any Tax Return, claim, filing, tax audit, tax protest, suit, proceeding or answer.

## ARTICLE XII

## MISCELLANEOUS

12.1 Expenses. Except as otherwise provided in this Agreement, each of Seller and Purchaser shall bear its own expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby.

12.2 Specific Performance. Seller acknowledges and agrees that the breach of this Agreement would cause irreparable damage to Purchaser and that Purchaser will not have an adequate remedy at law. Therefore, the obligations of Seller under this Agreement, including, without limitation, Seller's obligation to sell the Purchased Assets to Purchaser, shall be enforceable by a decree of specific performance issued by any court of competent jurisdiction, and appropriate injunctive relief may be applied for and granted in connection therewith. Such remedies shall, however, be cumulative and not exclusive and shall be in addition to any other remedies which any party may have under this Agreement or otherwise.

12.3 Submission to Jurisdiction; Consent to Service of Process; Arbitration.

- 44 -

218

(a)     For purposes of enforcing the rights set forth in Section 12.2, the parties hereto hereby irrevocably submit to the non-exclusive jurisdiction of any federal or state court located within Houston, Texas over any dispute arising out of or relating to this Agreement or any of the transactions contemplated hereby. The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(b)     Any controversy, dispute or claim arising under or in connection with this Agreement (including, without limitation, the existence, validity, interpretation or breach hereof and any claim based on contract, tort of statute) shall be resolved by a binding arbitration, to be held in Houston, Texas pursuant to the Federal Arbitration Act and in accordance with the then-prevailing Commercial Arbitration Rules of the American Arbitration Association (the "AAA"). If the amount in dispute exceeds $100,000, then AAA shall select three arbitrators; otherwise, it will select one. Each party shall bear its own expenses incurred in connection with arbitration and the fees and expenses of the arbitrators shall be shared equally by the parties involved in the dispute and advanced by them from time to time as required. It is the mutual intention and desire of the parties that the tribunal of arbitrators be constituted as expeditiously as possible following the submission of the dispute to arbitration. Once such tribunal is constituted and except as may otherwise be agreed in writing by the parties involved in such dispute or as ordered by the arbitrators upon substantial justification shown, the hearing for the dispute will be held within 60 days of submission of the dispute to arbitration. The arbitrators shall render their final award within 60 days, subject to extension by the arbitrators upon substantial justification shown of extraordinary circumstances, following conclusion of the hearing and any required post-hearing briefing or other proceedings ordered by the arbitrators. Any discovery in connection with arbitration hereunder shall be limited to information directly relevant to the controversy or claim in arbitration. The arbitrators shall be entitled to award pre-award interest to the prevailing party. The arbitrators will state the factual and legal basis for the award. The decision of the arbitrators in any such proceeding will be final and binding and not subject to judicial review and final judgment may he entered upon such an award in any court of competent jurisdiction, but entry of such judgment will not be required to make such award effective. Any action against any party hereto ancillary to arbitration (as determined by the arbitrators), including any action for provisional or conservatory measures or action to enforce an arbitration award or any judgment entered by any court in respect of any thereof may be brought in any federal or state court of competent jurisdiction located within the State of Texas, and the parties hereto hereby irrevocably submit to the non-exclusive jurisdiction of any federal or state court located within the State of Texas over any such action. The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such action brought in such court or any defense of inconvenient forum for the maintenance of such action. Each of the parties hereto agrees that a judgment in any such action may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(c)     Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by the delivery of a copy thereof in accordance with the provisions of Section 12.6.

- 45 -

219

**5**

## INTELLECTUAL PROPERTY, CONFIDENTIAL INFORMATION, AND NON-COMPETE AGREEMENT

THIS AGREEMENT is made by and between Schlumberger Technology Corporation, a Texas corporation acting for itself and on behalf of its Affiliates as more fully defined below (hereinafter collectively referred to as "Company") and _____Rick Drier_____ (hereinafter referred to as "Employee"), and shall be effective as of the __10__ day of __Sept__, 20_11_.

In consideration of the Company's employment of Employee, the Company's promise to provide Employee with Company Intellectual Property, as defined in Paragraph 5 below, the Company providing Employee with Company Intellectual Property, or the Company providing Employee with access to Company Intellectual Property, the payment of a salary or other remuneration, and other consideration, the Parties agree as follows:

1. Definitions.

   1.1. "Intellectual Property" is all patents, trademarks, copyrights, trade secrets, Company Confidential Information, new or useful arts, ideas, discoveries, inventions, improvements, software, business information, lists, information considered by Company to be confidential, designs, drawings, writings, contributions, works of authorship, findings or improvements, formulae, processes, product development, manufacturing techniques, business methods, tools, routines and methodology, documentation, systems, enhancements or modifications thereto, know-how, and developments, any derivative works and ideas whether or not patentable, and any other form of intellectual property.

   1.2. "Company Intellectual Property" is all Intellectual Property, that was authored, conceived, developed, or reduced to practice by Employee (either solely or jointly with others) during the term of his/her employment. Company Intellectual Property may be originated or conceived during the term of Employee's employment but completed or reduced to practice thereafter. Company Intellectual Property shall be deemed a "work made for hire" as that term is defined by the copyright laws of the United States. Company Intellectual Property also includes any "Pre-existing Intellectual Property" assigned, licensed, or transferred to Company, and any "Pre-existing Intellectual Property" in which Company has a vested or executory interest.

   1.3. "Pre-existing Intellectual Property" is all Intellectual Property that were authored, conceived, developed, or reduced to practice by Employee before the term of Employee's employment with the Company began.

   1.4. "Company Confidential Information" includes technical information, software, databases, methods, know-how, formulae, compositions, drawings, designs, data, prototypes, processes, discoveries, machines, inventions, well logs or other data, equipment, drawings, notes reports, manuals, business information, compensation data, clients lists, client preferences, client needs, client designs, financial information, credit information, pricing information, information relating to future plans, marketing strategies, new product research, pending projects and proposals, proprietary design processes, research and development strategies, information relating to employees, consultants and independent contractors including information relating to salaries, compensation, contracts, benefits, inceptive plans, positions, duties, qualifications, project knowledge, other valuable confidential information, trade secrets, patent applications, and related filings regardless of whether or not identified as confidential or proprietary, and similar items.

   1.5. "Affiliate" means any entity which now or in the future directly or indirectly controls, is

PLAINTIFF'S
EXHIBIT
1

controlled by, or is under common control with Company, where "control" in relation to a company means the direct or indirect ownership of at least fifty-percent of the voting securities or shares.

2. Employee agrees to promptly disclose in writing to Company all Company Intellectual Property. Company Intellectual Property shall remain the exclusive property of Company whether or not deemed to be a "work made for hire" within the meaning of the copyright laws of the United States.

Any and all rights, title, and ownership interests, including copyright, that Employee may have in or to Company Intellectual Property or any tangible media embodying such Company Intellectual Property, as well as any U.S. and international applications for patent or copyright registrations thereon during and subsequent to his/her employment are hereby assigned to Company, and Company shall have the royalty-free right to use such existing Company Intellectual Property without any further agreement between Company and Employee. Employee, however, does not assign or agree to assign to Company any Pre-existing Intellectual Property.

During and after employment with Company, Employee shall assist Company in obtaining patents, copyrights, and other indicia of ownership, protection for such inventions and copyrightable materials, including completing and executing any necessary documents, contracts, or agreements, with respect to all such Company Intellectual Property which Company shall, in its sole discretion, determine to obtain.

Employee shall disclose to Company Employee's complete written record of any Company Intellectual Property, including any patent applications, correspondence with patent agents and patent offices, research, written descriptions of the technology, test data, market data, notes, and any other information relating to Company Intellectual Property. Employee shall also identify all co-inventors, co-authors, co-composers, partners, joint venturers, assistants, or other people to whom the Company Intellectual Property was disclosed in whole or in part, who participated in developing the Company Intellectual Property, or who claim an interest in the Company Intellectual Property. Employee's disclosure shall conform to the policies and procedures in place at the time governing such disclosures.

Employee shall not destroy, modify, alter, or secret any document, tangible thing, or information relating to Company Intellectual Property or Company Intellectual Property except as occurs in the ordinary performance of Employee's employment.

3. Except as required in performing Employee's duties for the Company, Employee will not remove from Company's facilities any Company Confidential Information including but not limited to equipment, drawings, notes, reports, manuals, invention records, software, customer information, well logs or other data, or other material, whether produced by Employee or obtained from Company. This includes copying or transmitting such information via Personal Digital Assistants, mobile phones, external hard drives, USB "flash" drives, USB storage devices, FireWire storage devices, floppy discs, CD's, DVD's, personal email accounts (including web-based email accounts such as Hotmail, Gmail, Yahoo), memory cards, Zip discs, and all other similar media which can be used to transmit electronic data.

4. Employee agrees to deliver all such Company Confidential Information and materials to Company immediately upon request, and in any event upon termination of employment. If any such Company Confidential Information has been stored on any personal electronic data storage device, including a home or personal computer, Employee agrees to make available the device to the Company for removal and/or copying of the information. Employee will not publish or disclose or transfer to any person, other than in the proper performance of Employee's duties for the Company, or use in any way other than in Company's business, any trade secrets or confidential technical or business

information or material of Company—including Company Intellectual Property and Company Confidential Information, either during or after employment with Company.

5. Upon the signing of this Agreement, or reasonably soon thereafter, and in any event prior to the termination of Employee's employment, the Company will provide Employee and Employee will receive access to Company Confidential Information which is proprietary, confidential, valuable, and relates to Company's business.

Employee recognizes and acknowledges that Company Confidential Information, both tangibly recorded or memorized, constitutes valuable trade secrets belonging to Company. In order to protect Company against any unauthorized use or disclosure of Company Confidential Information, and in exchange for the Company's promise to provide Employee with access to Company Confidential Information and other consideration prior to the termination of his/her employment, Employee agrees that for a period of one (1) year following the date of termination of his/her employment with Company, Employee will not directly or indirectly work for or assist (whether as an owner, employee, consultant, contractor or otherwise) any business or commercial operation whose business is—even in part—in direct or indirect competition with any area of the Company's business in which Employee was employed by Company. Moreover, Employee agrees that Company may provide a copy of this Agreement to any entity for whom Employee provides services in the one (1) year period following the date of termination of Employee's employment with Company.

Employee recognizes and acknowledges that the Company's business, research and products are by nature worldwide in scope, and that the Company is not required to maintain a physical location in close proximity to its customers. Employee agrees that in order to protect Company Confidential Information, business interests and goodwill, the foregoing restriction on Employee's subsequent employment shall extend to any county, parish, borough, or foreign equivalent: (1) in which Employee had a customer or service assignment for Company in the one-year period preceding Employee's termination; (2) in which Company has customers or service assignments about which Employee obtained Company Intellectual Property during his/her employment with Company; (3) in which Company has a manufacturing site, development site, work site, job site, or offices; and/or (4) in which any business or commercial operation whose business (a) is—even in part—in direct or indirect competition with any area of the Company's business in which Employee was employed by Company or (b) has a manufacturing site, development site, work site, job site, or offices.

Employee shall comply with all Company's policies and codes of ethics as it may promulgate from time to time, including those related to intellectual property, confidential information, Company Confidential Information, and Company Intellectual Property. Nothing in those policies shall be deemed to modify, reduce, or waive Employee's obligations herein and in the event of any conflict or ambiguity, this Agreement prevails.

6. The obligations in the foregoing section do not apply to Employee if Employee is a lawyer licensed to practice law in any state in the United States and whose employment for the Company involves the practice of law where such duties in this Agreement would abrogate, modify, or contradict any applicable rules of professional conduct, codes of ethics, or professional responsibility obligations. However, to the maximum extent possible all duties in this Agreement—including duties of non-disclosure and confidentiality—shall be applicable to such lawyers to the extent they do not abrogate, modify, or contradict any applicable rules of professional conduct, codes of ethics, or professional responsibility obligations.

7. If Employee is found to have breached any promise made in Paragraph 5 of this Agreement, the one-year period specified in Paragraph 5 shall be extended by the period of time for which Employee was in breach so that Company has the full benefit of the one-year periods specified in Paragraph 5.

8. Employee acknowledges that Company has agreed to provide Employee with Company Confidential Information during Employee's employment with Company. Employee further acknowledges that, if Employee was to leave the employ of Company for any reason and use or disclose, directly or indirectly, Company Confidential Information, that such use and/or disclosure would cause Company irreparable harm and injury for which no adequate remedy at law exists. Therefore, in the event of the breach or threatened breach of the provisions of this Agreement by Employee, Company shall be entitled to obtain injunctive relief to enjoin such breach or threatened breach, in addition to all other remedies and alternatives which may be available at law or in equity. Employee acknowledges that the remedies contained in the Agreement for violation of this Agreement are not the exclusive remedies which Company may pursue.

9. Company has attempted to place the most reasonable limitations on Employee's subsequent employment opportunities consistent with the protection of Company's valuable trade secrets, Company Confidential Information, business interests, and goodwill. Employee acknowledges that the limitations contained herein, especially limitations as to time, scope, and geography, are reasonable. In order to accommodate Employee in obtaining subsequent employment, Company may, in its discretion, grant a waiver of one or more of the restrictions on subsequent employment contained in Paragraph 5. A request for a waiver shall be in writing and must be received by Company at least forty-five (45) days before the proposed starting date of the employment for which Employee is seeking a waiver. The request must include the full name and address of the organization with which Employee is seeking employment; the department or area in which Employee proposes to work; the position or job title to be held by Employee; and a complete description of the duties Employee expects to perform for such employer. If Company decides to grant a waiver (which shall be solely in Company's discretion), the waiver may be subject to such restrictions or conditions as Company may impose and shall not constitute a waiver of any other term.

10. Any waiver of any term of this Agreement by Company shall not operate as a waiver of any other term of this Agreement, nor shall any failure to enforce any provision of this Agreement operate as a waiver of Company's right to enforce any other provision of this Agreement.

11. Company does not wish to receive from Employee any confidential or proprietary information of a third party to whom Employee owes an obligation of confidence. Accordingly, Employee represents and warrants that any information Employee either discloses to Company or uses while employed by Company is not subject to any obligation of confidentiality to any former employer or other third party. Employee acknowledges that his or her performance of this Agreement and his or her duties as an employee of Company do not and will not breach any agreement to keep in confidence proprietary information, knowledge, or data acquired by Employee prior to Employee's employment with Company.

12. Employee is not a party to any other agreement that will interfere with Employee's full compliance with this Agreement or that otherwise may restrict Employee's employment by Company or the performance of Employee's duties for Company. Employee agrees not to enter into any agreement, whether oral or written, in conflict with this Agreement.

13. Employee agrees that while employed by Company, and during the one-year period following the termination of his/her employment, Employee will neither directly nor indirectly, on his/her own behalf or on behalf of any person or entity, in any capacity, recruit, hire, solicit, or assist others in recruiting, hiring, soliciting any person, who is, or was, during the period of Employee's employment with Company, an employee or consultant of Company.

14. This Agreement may be enforced by, shall inure to the benefit of, and be binding upon Company, its successors, and assigns. This Agreement is binding upon Employee's heirs and legal representatives. By accepting a transfer to an Affiliate of Company, Employee agrees to the automatic assignment of

this Agreement to said Affiliate contemporaneously with the acceptance of such transfer, subject to subsequent agreements executed by Employee and Affiliate of Company or Company, and to the fullest extent allowed by law.

15. By accepting a transfer to an Affiliate of Company, Employee agrees to the automatic application of all of the terms of this Agreement to said Affiliate contemporaneously with the acceptance of such transfer, subject to subsequent agreements executed by Employee and Affiliate of Company or Company, and to the fullest extent allowed by law.

16. This Agreement or any part thereof may be modified, superseded, waived, or amended only in writing signed by an authorized representative of Company and by Employee. Any appendices to this Agreement are part of this Agreement as if wholly incorporated herein.

17. Because Employee may work in various locations and to eliminate potential uncertainty over the governing law, this Agreement shall be interpreted and construed exclusively in accordance with the laws of the State of Texas. Venue for any dispute(s) arising from or related to this Agreement shall lie solely, and is convenient, in Fort Bend County, Texas. Employee consents to the choice of law and venue provisions of this Agreement and agrees that Employee will not contest these provisions in any future proceeding(s). Employee agrees that Texas, as Company's United States Headquarters, has a greater legal interest in matters relating to this Agreement than any other state, has a greater public policy interest in matters relating to this Agreement than any other state, and has a greater factual relationship to matters relating to this Agreement than any other state.

18. Should any portion of this Agreement be held judicially invalid, unenforceable, or void, such holding will not have the effect of invalidating or voiding the other portions of this Agreement not so declared or any part thereof, the parties hereby agreeing that the portion so held to be invalid, unenforceable, or void shall be deemed amended, reduced in scope or deleted to the extent required to be valid and enforceable in the jurisdiction of such holding. The parties agree that, upon a judicial finding of invalidity, unenforceability, or voidability, the court so finding may reform the agreement to the extent necessary for enforceability, and enter an order enforcing the reformed Agreement. No court ordered reformation or amendment shall give rise to a finding of knowing, willfulness, or bad faith unreasonableness against Company regarding this Agreement.

19. This Agreement and Appendix contains the entire agreement between the parties with respect to the subject matter of this Agreement and supersedes any previous understandings or agreements, whether written or oral, in respect of such subject matter.

| SCHLUMBERGER TECHNOLOGY CORPORATION | I HEREBY CERTIFY THAT I HAVE READ AND UNDERSTAND THIS AGREEMENT, AND THAT I AGREE TO ABIDE BY ITS TERMS. |
|---|---|
| Signed: _Wubba Si_ | EMPLOYEE |
| Printed Name: _Debbie Silhis_ | Signed: _Ricky Parker_ |
| Title: _HR Rep_ | Printed Name: _Ricky Parker_ |
| Date: _9/10/11_ | Date: _9/10/11_ |

## APPENDIX:
## INTELLECTUAL PROPERTY ASSIGNMENT, DISCLOSURE, AND WAIVER

The Intellectual Property, Confidential Information, and Non-Compete Agreement incorporates this Appendix and Employee promises to comply with the terms in this Appendix, and all rules, procedures, policies, and requirements that Company may promulgate consistent with this Appendix.

### Automatic Assignment

The Intellectual Property, Confidential Information, and Non-Compete Agreement contains an assignment of all Company Intellectual Property. Company, may in its sole discretion, waive that assignment upon Employee's request and after Employee's submission of an IP Disclosure Form.

### Employee's Duty to Disclose

For all Company Intellectual Property, Employee shall complete and submit to Company an IP Disclosure Form. Company's receipt or acceptance of an IP Disclosure Form shall not constitute an admission or agreement to any responses contained therein, shall not waive or modify any terms of any agreement between Company and Employee, and shall not obligate or bind Company.

Employee must complete and submit an IP Disclosure Form at conception of the invention, any derivative ideas or works, and any improvements or changes to existing knowledge or technology, or as soon as possible thereafter. Employee has a continuing obligation to update the IP Disclosure Form to maintain the form's completeness and correctness.

Employee may obtain an IP Disclosure Form from the Intellectual Property Department. Employee shall submit the completed form to Intellectual Property Department. If desired, Employee may request waiver anytime after submitting the IP Disclosure Form.

Employee must retain and prevent destruction of any material referenced in the IP Disclosure Form, including and not limited to photographs, drawings, schematics, diagrams, figures, testing and development logs, notes, journals, and results, applications to, correspondence with, or registrations from, any patent office, trademark office, copyright office, customs office, or other authority, contracts, licenses, assignments, liens, conveyances, pledges, or other documentation potentially affecting your ownership rights, marketing materials, web sites, press releases, brochures, or other promotional or informational material, any materials evidencing or related to reduction to practice, and other related documentation.

### Waiver of Automatic Assignment

Company may, in its sole discretion, waive the automatic assignment provision using such criteria as Company, in its sole discretion, may decide to use.

No waiver of the automatic assignment provision shall be effective without the submission of a complete and correct IP Disclosure Form.

No waiver of the automatic assignment provision is effective unless in a writing signed by a person authorized by Company. No waiver of the automatic assignment provision is effective if Employee's IP Disclosure Form is incomplete, incorrect, otherwise defective, or if any misrepresentation has been made.

Employee is estopped from asserting waiver, and any waiver shall be void and/or voidable, if the waiver is obtained in violation of the Intellectual Property, Confidential Information, and Non-Compete Agreement, this Appendix, or obtained through fraud, negligence, failure to disclose, or incorrect,

incomplete, or defective responses to an IP Disclosure Form.

| SCHLUMBERGER TECHNOLOGY CORPORATION | I HEREBY CERTIFY THAT I HAVE READ AND UNDERSTAND THIS APPENDIX, AND THAT I AGREE TO ABIDE BY ITS TERMS. |
|---|---|
| Signed: _Debbie Siff_ | EMPLOYEE |
| Printed Name: _Debbie Sitig_ | Signed: _De Hf_ |
| Title: _HR Rep_ | Printed Name: _Ricky Parker_ |
| Date: _9/10/11_ | Date: _9/10/11_ |

**6**

## INTELLECTUAL PROPERTY, CONFIDENTIAL INFORMATION, AND NON-COMPETE AGREEMENT

THIS AGREEMENT is made by and between Schlumberger Technology Corporation, a Texas corporation acting for itself and on behalf of its Affiliates as more fully defined below (hereinafter collectively referred to as "Company") and _____ _James Myer_ ____ (hereinafter referred to as "Employee"), and shall be effective as of the _10_ day of _September_, 20_11_.

In consideration of the Company's employment of Employee, the Company's promise to provide Employee with Company Intellectual Property, as defined in Paragraph 5 below, the Company providing Employee with Company Intellectual Property, or the Company providing Employee with access to Company Intellectual Property, the payment of a salary or other remuneration, and other consideration, the Parties agree as follows:

1. <u>Definitions.</u>

   1.1. "Intellectual Property" is all patents, trademarks, copyrights, trade secrets, Company Confidential Information, new or useful arts, ideas, discoveries, inventions, improvements, software, business information, lists, information considered by Company to be confidential, designs, drawings, writings, contributions, works of authorship, findings or improvements, formulae, processes, product development, manufacturing techniques, business methods, tools, routines and methodology, documentation, systems, enhancements or modifications thereto, know-how, and developments, any derivative works and ideas whether or not patentable, and any other form of intellectual property.

   1.2. "Company Intellectual Property" is all Intellectual Property, that was authored, conceived, developed, or reduced to practice by Employee (either solely or jointly with others) during the term of his/her employment. Company Intellectual Property may be originated or conceived during the term of Employee's employment but completed or reduced to practice thereafter. Company Intellectual Property shall be deemed a "work made for hire" as that term is defined by the copyright laws of the United States. Company Intellectual Property also includes any "Pre-existing Intellectual Property" assigned, licensed, or transferred to Company, and any "Pre-existing Intellectual Property" in which Company has a vested or executory interest.

   1.3. "Pre-existing Intellectual Property" is all Intellectual Property that were authored, conceived, developed, or reduced to practice by Employee before the term of Employee's employment with the Company began.

   1.4. "Company Confidential Information" includes technical information, software, databases, methods, know-how, formulae, compositions, drawings, designs, data, prototypes, processes, discoveries, machines, inventions, well logs or other data, equipment, drawings, notes reports, manuals, business information, compensation data, clients lists, client preferences, client needs, client designs, financial information, credit information, pricing information, information relating to future plans, marketing strategies, new product research, pending projects and proposals, proprietary design processes, research and development strategies, information relating to employees, consultants and independent contractors including information relating to salaries, compensation, contracts, benefits, inceptive plans, positions, duties, qualifications, project knowledge, other valuable confidential information, trade secrets, patent applications, and related filings regardless of whether or not identified as confidential or proprietary, and similar items.

   1.5. "Affiliate" means any entity which now or in the future directly or indirectly controls, is



PLAINTIFF'S
EXHIBIT
2

controlled by, or is under common control with Company, where "control" in relation to a company means the direct or indirect ownership of at least fifty-percent of the voting securities or shares.

2. Employee agrees to promptly disclose in writing to Company all Company Intellectual Property. Company Intellectual Property shall remain the exclusive property of Company whether or not deemed to be a "work made for hire" within the meaning of the copyright laws of the United States.

Any and all rights, title, and ownership interests, including copyright, that Employee may have in or to Company Intellectual Property or any tangible media embodying such Company Intellectual Property, as well as any U.S. and international applications for patent or copyright registrations thereon during and subsequent to his/her employment are hereby assigned to Company, and Company shall have the royalty-free right to use such existing Company Intellectual Property without any further agreement between Company and Employee. Employee, however, does not assign or agree to assign to Company any Pre-existing Intellectual Property.

During and after employment with Company, Employee shall assist Company in obtaining patents, copyrights, and other indicia of ownership, protection for such inventions and copyrightable materials, including completing and executing any necessary documents, contracts, or agreements, with respect to all such Company Intellectual Property which Company shall, in its sole discretion, determine to obtain.

Employee shall disclose to Company Employee's complete written record of any Company Intellectual Property, including any patent applications, correspondence with patent agents and patent offices, research, written descriptions of the technology, test data, market data, notes, and any other information relating to Company Intellectual Property. Employee shall also identify all co-inventors, co-authors, co-composers, partners, joint venturers, assistants, or other people to whom the Company Intellectual Property was disclosed in whole or in part, who participated in developing the Company Intellectual Property, or who claim an interest in the Company Intellectual Property. Employee's disclosure shall conform to the policies and procedures in place at the time governing such disclosures.

Employee shall not destroy, modify, alter, or secret any document, tangible thing, or information relating to Company Intellectual Property or Company Intellectual Property except as occurs in the ordinary performance of Employee's employment.

3. Except as required in performing Employee's duties for the Company, Employee will not remove from Company's facilities any Company Confidential Information including but not limited to equipment, drawings, notes, reports, manuals, invention records, software, customer information, well logs or other data, or other material, whether produced by Employee or obtained from Company. This includes copying or transmitting such information via Personal Digital Assistants, mobile phones, external hard drives, USB "flash" drives, USB storage devices, FireWire storage devices, floppy discs, CD's, DVD's, personal email accounts (including web-based email accounts such as Hotmail, Gmail, Yahoo), memory cards, Zip discs, and all other similar media which can be used to transmit electronic data.

4. Employee agrees to deliver all such Company Confidential Information and materials to Company immediately upon request, and in any event upon termination of employment. If any such Company Confidential Information has been stored on any personal electronic data storage device, including a home or personal computer, Employee agrees to make available the device to the Company for removal and/or copying of the information. Employee will not publish or disclose or transfer to any person, other than in the proper performance of Employee's duties for the Company, or use in any way other than in Company's business, any trade secrets or confidential technical or business

information or material of Company—including Company Intellectual Property and Company Confidential Information, either during or after employment with Company.

5. Upon the signing of this Agreement, or reasonably soon thereafter, and in any event prior to the termination of Employee's employment, the Company will provide Employee and Employee will receive access to Company Confidential Information which is proprietary, confidential, valuable, and relates to Company's business.

Employee recognizes and acknowledges that Company Confidential Information, both tangibly recorded or memorized, constitutes valuable trade secrets belonging to Company. In order to protect Company against any unauthorized use or disclosure of Company Confidential Information, and in exchange for the Company's promise to provide Employee with access to Company Confidential Information and other consideration prior to the termination of his/her employment, Employee agrees that for a period of one (1) year following the date of termination of his/her employment with Company, Employee will not directly or indirectly work for or assist (whether as an owner, employee, consultant, contractor or otherwise) any business or commercial operation whose business is—even in part—in direct or indirect competition with any area of the Company's business in which Employee was employed by Company. Moreover, Employee agrees that Company may provide a copy of this Agreement to any entity for whom Employee provides services in the one (1) year period following the date of termination of Employee's employment with Company.

Employee recognizes and acknowledges that the Company's business, research and products are by nature worldwide in scope, and that the Company is not required to maintain a physical location in close proximity to its customers. Employee agrees that in order to protect Company Confidential Information, business interests and goodwill, the foregoing restriction on Employee's subsequent employment shall extend to any county, parish, borough, or foreign equivalent: (1) in which Employee had a customer or service assignment for Company in the one-year period preceding Employee's termination; (2) in which Company has customers or service assignments about which Employee obtained Company Intellectual Property during his/her employment with Company; (3) in which Company has a manufacturing site, development site, work site, job site, or offices; and/or (4) in which any business or commercial operation whose business (a) is—even in part—in direct or indirect competition with any area of the Company's business in which Employee was employed by Company or (b) has a manufacturing site, development site, work site, job site, or offices.

Employee shall comply with all Company's policies and codes of ethics as it may promulgate from time to time, including those related to intellectual property, confidential information, Company Confidential Information, and Company Intellectual Property. Nothing in those policies shall be deemed to modify, reduce, or waive Employee's obligations herein and in the event of any conflict or ambiguity, this Agreement prevails.

6. The obligations in the foregoing section do not apply to Employee if Employee is a lawyer licensed to practice law in any state in the United States and whose employment for the Company involves the practice of law where such duties in this Agreement would abrogate, modify, or contradict any applicable rules of professional conduct, codes of ethics, or professional responsibility obligations. However, to the maximum extent possible all duties in this Agreement—including duties of non-disclosure and confidentiality—shall be applicable to such lawyers to the extent they do not abrogate, modify, or contradict any applicable rules of professional conduct, codes of ethics, or professional responsibility obligations.

7. If Employee is found to have breached any promise made in Paragraph 5 of this Agreement, the one-year period specified in Paragraph 5 shall be extended by the period of time for which Employee was in breach so that Company has the full benefit of the one-year periods specified in Paragraph 5.

8. Employee acknowledges that Company has agreed to provide Employee with Company Confidential Information during Employee's employment with Company. Employee further acknowledges that, if Employee was to leave the employ of Company for any reason and use or disclose, directly or indirectly, Company Confidential Information, that such use and/or disclosure would cause Company irreparable harm and injury for which no adequate remedy at law exists. Therefore, in the event of the breach or threatened breach of the provisions of this Agreement by Employee, Company shall be entitled to obtain injunctive relief to enjoin such breach or threatened breach, in addition to all other remedies and alternatives which may be available at law or in equity. Employee acknowledges that the remedies contained in the Agreement for violation of this Agreement are not the exclusive remedies which Company may pursue.

9. Company has attempted to place the most reasonable limitations on Employee's subsequent employment opportunities consistent with the protection of Company's valuable trade secrets, Company Confidential Information, business interests, and goodwill. Employee acknowledges that the limitations contained herein, especially limitations as to time, scope, and geography, are reasonable. In order to accommodate Employee in obtaining subsequent employment, Company may, in its discretion, grant a waiver of one or more of the restrictions on subsequent employment contained in Paragraph 5. A request for a waiver shall be in writing and must be received by Company at least forty-five (45) days before the proposed starting date of the employment for which Employee is seeking a waiver. The request must include the full name and address of the organization with which Employee is seeking employment; the department or area in which Employee proposes to work; the position or job title to be held by Employee; and a complete description of the duties Employee expects to perform for such employer. If Company decides to grant a waiver (which shall be solely in Company's discretion), the waiver may be subject to such restrictions or conditions as Company may impose and shall not constitute a waiver of any other term.

10. Any waiver of any term of this Agreement by Company shall not operate as a waiver of any other term of this Agreement, nor shall any failure to enforce any provision of this Agreement operate as a waiver of Company's right to enforce any other provision of this Agreement.

11. Company does not wish to receive from Employee any confidential or proprietary information of a third party to whom Employee owes an obligation of confidence. Accordingly, Employee represents and warrants that any information Employee either discloses to Company or uses while employed by Company is not subject to any obligation of confidentiality to any former employer or other third party. Employee acknowledges that his or her performance of this Agreement and his or her duties as an employee of Company do not and will not breach any agreement to keep in confidence proprietary information, knowledge, or data acquired by Employee prior to Employee's employment with Company.

12. Employee is not a party to any other agreement that will interfere with Employee's full compliance with this Agreement or that otherwise may restrict Employee's employment by Company or the performance of Employee's duties for Company. Employee agrees not to enter into any agreement, whether oral or written, in conflict with this Agreement.

13. Employee agrees that while employed by Company, and during the one-year period following the termination of his/her employment, Employee will neither directly nor indirectly, on his/her own behalf or on behalf of any person or entity, in any capacity, recruit, hire, solicit, or assist others in recruiting, hiring, soliciting any person, who is, or was, during the period of Employee's employment with Company, an employee or consultant of Company.

14. This Agreement may be enforced by, shall inure to the benefit of, and be binding upon Company, its successors, and assigns. This Agreement is binding upon Employee's heirs and legal representatives. By accepting a transfer to an Affiliate of Company, Employee agrees to the automatic assignment of

this Agreement to said Affiliate contemporaneously with the acceptance of such transfer, subject to subsequent agreements executed by Employee and Affiliate of Company or Company, and to the fullest extent allowed by law.

15. By accepting a transfer to an Affiliate of Company, Employee agrees to the automatic application of all of the terms of this Agreement to said Affiliate contemporaneously with the acceptance of such transfer, subject to subsequent agreements executed by Employee and Affiliate of Company or Company, and to the fullest extent allowed by law.

16. This Agreement or any part thereof may be modified, superseded, waived, or amended only in writing signed by an authorized representative of Company and by Employee. Any appendices to this Agreement are part of this Agreement as if wholly incorporated herein.

17. Because Employee may work in various locations and to eliminate potential uncertainty over the governing law, this Agreement shall be interpreted and construed exclusively in accordance with the laws of the State of Texas. Venue for any dispute(s) arising from or related to this Agreement shall lie solely, and is convenient, in Fort Bend County, Texas. Employee consents to the choice of law and venue provisions of this Agreement and agrees that Employee will not contest these provisions in any future proceeding(s). Employee agrees that Texas, as Company's United States Headquarters, has a greater legal interest in matters relating to this Agreement than any other state, has a greater public policy interest in matters relating to this Agreement than any other state, and has a greater factual relationship to matters relating to this Agreement than any other state.

18. Should any portion of this Agreement be held judicially invalid, unenforceable, or void, such holding will not have the effect of invalidating or voiding the other portions of this Agreement not so declared or any part thereof, the parties hereby agreeing that the portion so held to be invalid, unenforceable, or void shall be deemed amended, reduced in scope or deleted to the extent required to be valid and enforceable in the jurisdiction of such holding. The parties agree that, upon a judicial finding of invalidity, unenforceability, or voidability, the court so finding may reform the agreement to the extent necessary for enforceability, and enter an order enforcing the reformed Agreement. No court ordered reformation or amendment shall give rise to a finding of knowing, willfulness, or bad faith unreasonableness against Company regarding this Agreement.

19. This Agreement and Appendix contains the entire agreement between the parties with respect to the subject matter of this Agreement and supersedes any previous understandings or agreements, whether written or oral, in respect of such subject matter.

| SCHLUMBERGER TECHNOLOGY CORPORATION | I HEREBY CERTIFY THAT I HAVE READ AND UNDERSTAND THIS AGREEMENT, AND THAT I AGREE TO ABIDE BY ITS TERMS. |
|---|---|
| Signed: _Debbie Sf_ | EMPLOYEE |
| Printed Name: _Debbie Siths_ | Signed: _James_ |
| Title: _HR_ | Printed Name: _James Myers_ |
| Date: _9/10/2011_ | Date: _9/10/11_ |

# APPENDIX:
## INTELLECTUAL PROPERTY ASSIGNMENT, DISCLOSURE, AND WAIVER

The Intellectual Property, Confidential Information, and Non-Compete Agreement incorporates this Appendix and Employee promises to comply with the terms in this Appendix, and all rules, procedures, policies, and requirements that Company may promulgate consistent with this Appendix.

### Automatic Assignment

The Intellectual Property, Confidential Information, and Non-Compete Agreement contains an assignment of all Company Intellectual Property. Company, may in its sole discretion, waive that assignment upon Employee's request and after Employee's submission of an IP Disclosure Form.

### Employee's Duty to Disclose

For all Company Intellectual Property, Employee shall complete and submit to Company an IP Disclosure Form. Company's receipt or acceptance of an IP Disclosure Form shall not constitute an admission or agreement to any responses contained therein, shall not waive or modify any terms of any agreement between Company and Employee, and shall not obligate or bind Company.

Employee must complete and submit an IP Disclosure Form at conception of the invention, any derivative ideas or works, and any improvements or changes to existing knowledge or technology, or as soon as possible thereafter. Employee has a continuing obligation to update the IP Disclosure Form to maintain the form's completeness and correctness.

Employee may obtain an IP Disclosure Form from the Intellectual Property Department. Employee shall submit the completed form to Intellectual Property Department. If desired, Employee may request waiver anytime after submitting the IP Disclosure Form.

Employee must retain and prevent destruction of any material referenced in the IP Disclosure Form, including and not limited to photographs, drawings, schematics, diagrams, figures, testing and development logs, notes, journals, and results, applications to, correspondence with, or registrations from, any patent office, trademark office, copyright office, customs office, or other authority, contracts, licenses, assignments, liens, conveyances, pledges, or other documentation potentially affecting your ownership rights, marketing materials, web sites, press releases, brochures, or other promotional or informational material, any materials evidencing or related to reduction to practice, and other related documentation.

### Waiver of Automatic Assignment

Company may, in its sole discretion, waive the automatic assignment provision using such criteria as Company, in its sole discretion, may decide to use.

No waiver of the automatic assignment provision shall be effective without the submission of a complete and correct IP Disclosure Form.

No waiver of the automatic assignment provision is effective unless in a writing signed by a person authorized by Company. No waiver of the automatic assignment provision is effective if Employee's IP Disclosure Form is incomplete, incorrect, otherwise defective, or if any misrepresentation has been made.

Employee is estopped from asserting waiver, and any waiver shall be void and/or voidable, if the waiver is obtained in violation of the Intellectual Property, Confidential Information, and Non-Compete Agreement, this Appendix, or obtained through fraud, negligence, failure to disclose, or incorrect,

incomplete, or defective responses to an IP Disclosure Form.

| SCHLUMBERGER TECHNOLOGY CORPORATION · | I HEREBY CERTIFY THAT I HAVE READ AND UNDERSTAND THIS APPENDIX, AND THAT I AGREE TO ABIDE BY ITS TERMS. |
|---|---|
| Signed: _Debbie Sipp_ | EMPLOYEE |
| Printed Name: _Debbie Sitts_ | Signed: _James myes_ |
| Title: _HR_ | Printed Name: _James myer_ |
| Date: _9/10/11_ | Date: _9/10/11_ |

7



PLAINTIFF'S
EXHIBIT
3

**Production Wireline and Cased Hole Services Group, LLC**
**a Schlumberger Company**

**Retention Bonus Contract**

This Retention Bonus Contract (this "Agreement") is made and entered into by James O. Meyers ("Employee") and Production Wireline and Cased Hole Services Group, LLC (the "Company") and is effective as of September 15, 2011 (the "Effective Date"). The terms and conditions of this Agreement are as follows:

1. Retention Bonus Amount. As an incentive for Employee to remain employed with the Company, and as consideration for Employee's agreement to be bound by the terms of this Agreement, Employee will be eligible to receive the Bonus Award set forth in the attached Schedule A in accordance with the following payment schedule.

2. Payment Dates. Receipt of the Bonus Award is contingent on Employee's continued employment with the Company and compliance with the terms of this Agreement. The Bonus Award will be payable on the dates specified in the Payment Schedule below. The period of time between the Effective Date and the Final Payment Date will be referred to herein as the "Restricted Period."

(a) Payment Schedule.

First Payment Date – December 15, 2011 – 20% of the Bonus Award.

Second Payment Date – September 15, 2012 – 30% of the Bonus Award

Final Payment Date – September 15, 2013 – the remaining 50% of the Bonus Award.

Except as provided below, if there is any Termination of Employment as hereinafter defined during the period prior the Final Payment Date, Employee will not be eligible for any award amounts not yet paid as of the date Employee's employment with the Company ends.

(b) Acceleration on Death or Disability. Upon Termination of Employment from the Company by reason of Employee's death or disability (as determined by the Company in accordance with applicable policies and legal standards), the Award shall immediately become payable in full.

(c) Changes in Employment. Although no Bonus Awards are normally deemed earned until the Payment Dates, there are certain circumstances where Employee will be eligible to receive the Bonus Award. In the event of Employee's layoff due to a downturn in the industry or employment loss due to a transfer of Employee's position outside the Company (such as outsourcing), the Bonus Award shall be deemed to be earned and payable at that time. Further, if Employee is transferred to a different position within Schlumberger, whether inside or outside of the Slickline Services business, the Bonus Award payment schedule shall remain in effect as if no change in employment had occurred.

(d) Proration. If Employee is on a leave of absence under any of the company's leave of absence policies during the Restricted Period, the bonus amount will be reduced pro rata by the amount of time Employee is on the leave of absence. At each of the Payment Dates set forth in (a) above, the amount of the

payment will be reduced based on the amount of time Employee was on a leave of absence.

3. **Payment Timing.** Payment of Bonus Awards shall be made as soon as administratively practicable in accordance with monthly payroll schedules following the Bonus Award Payment Dates and confirmation that Employee has complied with the requirements for payment.

4. **Conditions of Payment.** All of the following conditions must be met before the Bonus Award will be payable:

   (a) Employee signs and in all respects complies with this Agreement.

   (b) Employee remains actively employed with the Company from the Effective Date through the applicable Bonus Award Payment Dates.

   (c) Employee is not terminated for violation of any Company policies or otherwise terminated for cause.

5. **Restrictions on Use of Confidential Information and on Post-Employment Activities.** During the term of this Agreement, the Company will provide Employee with access to non-public business information regarding the Company ("Confidential Information") necessary to perform Employee's duties for the Company. In consideration for access to the Company's Confidential Information, the sufficiency of which is hereby acknowledged by Employee, Employee agrees keep the Confidential Information, and all documentation and information relating thereto, strictly confidential. Employee agrees to return to the Company all property, including without limitation all documents (and all copies), email communications, computer data and other Company Materials, whether or not they contain Confidential Information, upon the earlier of Employee's separation from employment for whatever reason or at the request of Employee's supervisor or manager before separation of employment.

As a further condition of eligibility for the Bonus Award, and as additional protection for the Company's Confidential Information, Employee agrees that:

   (a) During Employee's employment with the Company and for a period of one year following the end of that employment, Employee will not solicit, contact or accept work, which is the same or substantially similar to work and/or services performed by Employee for Company, from clients of Company with whom Employee had business dealings during Employee's employment with the Company;

   (b) During Employee's employment by the Company and for a period of one year following the end of that employment, Employee will not provide services (including consulting services), which are the same or substantially similar to services and/or work performed by Employee for Company, to clients of Company with whom Employee had business dealings during Employee's employment with Company;

   (c) During Employee's employment with the Company and for a period of one year following the end of that employment, Employee will not solicit, recruit, encourage, hire or assist any other person or entity to solicit, recruit, encourage or hire for employment any other employee or independent contractor to work for a competitor of the Company;

   (d) During Employee's employment with the Company and for a period of one year following the end of that employment, Employee will not directly or indirectly own, manage, operate, control, be employed by, be a consultant for, or perform any job functions for, any business that is in competition with Company that is

located or performs services within the geographic territory serviced by the Company's offices where Employee has been employed during the one year immediately before the end of Employee's employment with Company or any Affiliate. A "business that is in competition with Company" is defined as a business that provides or offers the same or similar services, goods or material to those offered by Company or any Affiliate for which Employee works or performs services during the term of Employee's employment. The restriction contained herein relating to becoming employed by, being a consultant for, or performing job functions for a business that is in completion with Company is limited to employment duties or job functions which are the same or substantially similar to those performed by Employee for Company or an Affiliate during the one year immediately before the end of Employee's employment with the Company.

6.    Restrictions on Transfer and Assignment.

(a) The Bonus Award granted hereunder to Employee may not be sold, assigned, transferred, pledged or otherwise encumbered by Employee, whether voluntarily or involuntarily, by operation of law or otherwise, other than to the Company.

(b) Consistent with the foregoing, no right or benefit under this program shall be subject to transfer, anticipation, alienation, sale, assignment, pledge, encumbrance or charge, whether voluntary, involuntary, by operation of law or otherwise, and any attempt to transfer, anticipate, alienate, sell, assign, pledge, encumber or charge the same shall be void. No right or benefit hereunder shall in any manner be liable for or subject to any debts, contracts, liabilities or torts of the person entitled to such benefits. If Employee shall attempt to transfer, anticipate, alienate, assign, sell, pledge, encumber or charge any right or benefit hereunder, or if any creditor shall attempt to subject the same to a writ of garnishment, attachment, execution, sequestration, or any other form of process or involuntary lien or seizure, then such attempt shall have no effect and shall be void.

7.    Limitation of Rights. Nothing in this Agreement alters the at-will status of employment with the Company or creates a contract guaranteeing employment for a specified period of time. Either the Company or Employee may end the employment relationship at any time and for any reason.

8.    No Waiver. The failure of Employee or the Company to insist upon strict compliance with any provision of this Agreement or the failure to assert any right Employee or the Company may have under this Agreement shall not be deemed to be a waiver of such provision or right, or any other provision or right of this Agreement.

9.    Definitions.

(a) "Termination of Employment" means the termination of Employee's employment with the Company and its subsidiaries and affiliates. Temporary absences from employment because of illness, vacation or leave of absence and transfers among the Company and its subsidiaries and affiliates will not be considered a Termination of Employment. Any questions as to whether and when there has been a Termination of Employment, and the cause of such termination, shall be determined by the Company, and its determination will be final.

(b) "Company" means Production Wireline and Cased Hole Services Group, LLC, its parent company, subsidiaries, divisions, and affiliated businesses.

(c) "Affiliate" means any corporation which now or in the future, directly or indirectly controls, is controlled by or is under common control with Company, where "control" in relation to any corporation means the ownership directly or indirectly of at least fifty (50%) in voting securities.

10.    Entire Agreement. The terms and conditions herein control this Agreement, subject to the provisions of the Bonus Award and administrative interpretations thereof, notwithstanding any provisions in any employment agreement or in any prior awards. This Agreement may not be amended or modified except by a written agreement. The captions of this Agreement are not part of the provisions hereof and shall have no force or effect.

11.    Governing Law. The validity, interpretation and performance of this Agreement and dispute connected herewith shall be governed by and construed according to the laws of the State of Texas, without regard to principles of conflicts of law, and shall be enforced in a court of competent jurisdiction in Texas. The parties acknowledge and agree that the courts of the State of Texas and, in particular, the Judicial District Courts of Fort Bend County, Texas have exclusive jurisdiction to settle any dispute, and/or controversy whatsoever nature arising out of or relating to this Agreement. In this regard, Recipient and Production Wireline and Cased Hole Services Group, LLC irrevocably consent and agree to submit to the jurisdiction and venue of the Judicial District Courts of Fort Bend County, Texas and irrevocably waive any objection which either may have to the same.

12.    Severability. The invalidity or unenforceability of any provision of this program shall not affect the validity or enforceability of any other provision of this program. Provided that, the Company's obligation to pay the Award is conditioned upon Employee's complying with the provisions of paragraph 5 as written. If Employee challenges the enforceability of any provision of paragraph 5, or if a court finds any provision to be unenforceable, Employee shall not be entitled to receive the Award and will repay to the Company any Award previously paid to Employee.

Employee Signature: _____

Printed Name: ____James P Myers____

Date: ___9/10/11____

Production Wireline and Cased Hole Services Group, LLC

By: _____

Printed Name: Earl H. Dearborn

Title: U.S. Region Manager, Slickline

Date: ___9/10/11____

## SCHEDULE A

### Maximum Bonus Award

Operations Manager, Parker Energy        $██████ USD (One Hundred Thousand Dollars)

8

Oklahoma Statutes Annotated
Title 15. Contracts
Chapter 4. Unlawful Contracts

15 Okl.St.Ann. § 217

§ 217. Restraint of trade

Currentness

Every contract by which any one is restrained from exercising a lawful profession, trade or business of any kind, otherwise than as provided by Sections 218 and 219 of this title, or otherwise than as provided by Section 2 of this act, [1] is to that extent void.

**Credits**
R.L.1910, § 978. Laws 1989, c. 359, § 1, emerg. eff. June 3, 1989; Laws 2001, c. 406, § 3, emerg. eff. June 4, 2001.

Notes of Decisions (97)

Footnotes
1      So in enrolled bill; see O.S.L. 2001, c. 406, § 4 (Title 15, § 219A).
15 Okl. St. Ann. § 217, OK ST T. 15 § 217
Current through Chapter 430 (End) of the Second Session of the 54th Legislature (2014)

**End of Document**                         © 2015 Thomson Reuters. No claim to original U.S. Government Works.

9

Oklahoma Statutes Annotated
  Title 15. Contracts
    Chapter 4. Unlawful Contracts

15 Okl.St.Ann. § 219A

§ 219A. Noncompetition agreements

Currentness

A. A person who makes an agreement with an employer, whether in writing or verbally, not to compete with the employer after the employment relationship has been terminated, shall be permitted to engage in the same business as that conducted by the former employer or in a similar business as that conducted by the former employer as long as the former employee does not directly solicit the sale of goods, services or a combination of goods and services from the established customers of the former employer.

B. Any provision in a contract between an employer and an employee in conflict with the provisions of this section shall be void and unenforceable.

**Credits**
Laws 2001, c. 406, § 4, emerg. eff. June 4, 2001.

Notes of Decisions (16)

15 Okl. St. Ann. § 219A, OK ST T. 15 § 219A
Current through Chapter 430 (End) of the Second Session of the 54th Legislature (2014)

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

**10**

| Vernon's Texas Statutes and Codes Annotated |
| :--- |
|    Business and Commerce Code (Refs & Annos) |
|      Title 2. Competition and Trade Practices |
|        Chapter 15. Monopolies, Trusts and Conspiracies in Restraint of Trade (Refs & Annos) |
|          Subchapter E. Covenants Not to Compete (Refs & Annos) |

V.T.C.A., Bus. & C. § 15.50

§ 15.50. Criteria for Enforceability of Covenants Not to Compete

Effective: September 1, 2009
Currentness

(a) Notwithstanding Section 15.05 of this code, and subject to any applicable provision of Subsection (b), a covenant not to compete is enforceable if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee.

(b) A covenant not to compete relating to the practice of medicine is enforceable against a person licensed as a physician by the Texas Medical Board if such covenant complies with the following requirements:

  (1) the covenant must:

    (A) not deny the physician access to a list of his patients whom he had seen or treated within one year of termination of the contract or employment;

    (B) provide access to medical records of the physician's patients upon authorization of the patient and any copies of medical records for a reasonable fee as established by the Texas Medical Board under Section 159.008, Occupations Code; and

    (C) provide that any access to a list of patients or to patients' medical records after termination of the contract or employment shall not require such list or records to be provided in a format different than that by which such records are maintained except by mutual consent of the parties to the contract;

  (2) the covenant must provide for a buy out of the covenant by the physician at a reasonable price or, at the option of either party, as determined by a mutually agreed upon arbitrator or, in the case of an inability to agree, an arbitrator of the court whose decision shall be binding on the parties; and

  (3) the covenant must provide that the physician will not be prohibited from providing continuing care and treatment to a specific patient or patients during the course of an acute illness even after the contract or employment has been terminated.

(c) Subsection (b) does not apply to a physician's business ownership interest in a licensed hospital or licensed ambulatory surgical center.

**Credits**

Added by Acts 1989, 71st Leg., ch. 1193, § 1, eff. Aug. 28, 1989. Amended by Acts 1993, 73rd Leg., ch. 965, § 1, eff. Sept. 1, 1993; Acts 1999, 76th Leg., ch. 1574, § 1, eff. Sept. 1, 1999; Acts 2001, 77th Leg., ch. 1420, § 14.729, eff. Sept. 1, 2001; Acts 2009, 81st Leg., ch. 971, § 1, eff. Sept. 1, 2009.

Notes of Decisions (315)

V. T. C. A., Bus. & C. § 15.50, TX BUS & COM § 15.50
Current through the end of the 2013 Third Called Session of the 83rd Legislature

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

---

**11**

```
Vernon's Texas Statutes and Codes Annotated
  Business and Commerce Code (Refs & Annos)
    Title 2. Competition and Trade Practices
      Chapter 15. Monopolies, Trusts and Conspiracies in Restraint of Trade (Refs & Annos)
        Subchapter E. Covenants Not to Compete (Refs & Annos)
```

V.T.C.A., Bus. & C. § 15.51

§ 15.51. Procedures and Remedies in Actions to Enforce Covenants Not to Compete

Currentness

(a) Except as provided in Subsection (c) of this section, a court may award the promisee under a covenant not to compete damages, injunctive relief, or both damages and injunctive relief for a breach by the promisor of the covenant.

(b) If the primary purpose of the agreement to which the covenant is ancillary is to obligate the promisor to render personal services, for a term or at will, the promisee has the burden of establishing that the covenant meets the criteria specified by Section 15.50 of this code. If the agreement has a different primary purpose, the promisor has the burden of establishing that the covenant does not meet those criteria. For the purposes of this subsection, the "burden of establishing" a fact means the burden of persuading the triers of fact that the existence of the fact is more probable than its nonexistence.

(c) If the covenant is found to be ancillary to or part of an otherwise enforceable agreement but contains limitations as to time, geographical area, or scope of activity to be restrained that are not reasonable and impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee, the court shall reform the covenant to the extent necessary to cause the limitations contained in the covenant as to time, geographical area, and scope of activity to be restrained to be reasonable and to impose a restraint that is not greater than necessary to protect the goodwill or other business interest of the promisee and enforce the covenant as reformed, except that the court may not award the promisee damages for a breach of the covenant before its reformation and the relief granted to the promisee shall be limited to injunctive relief. If the primary purpose of the agreement to which the covenant is ancillary is to obligate the promisor to render personal services, the promisor establishes that the promisee knew at the time of the execution of the agreement that the covenant did not contain limitations as to time, geographical area, and scope of activity to be restrained that were reasonable and the limitations imposed a greater restraint than necessary to protect the goodwill or other business interest of the promisee, and the promisee sought to enforce the covenant to a greater extent than was necessary to protect the goodwill or other business interest of the promisee, the court may award the promisor the costs, including reasonable attorney's fees, actually and reasonably incurred by the promisor in defending the action to enforce the covenant.

**Credits**
Added by Acts 1989, 71st Leg., ch. 1193, § 1, eff. Aug. 28, 1989. Amended by Acts 1993, 73rd Leg., ch. 965, § 2, eff. Sept. 1, 1993.

Notes of Decisions (109)

V. T. C. A., Bus. & C. § 15.51, TX BUS & COM § 15.51
Current through the end of the 2013 Third Called Session of the 83rd Legislature

**End of Document**                                                     © 2015 Thomson Reuters. No claim to original U.S. Government Works.